270

EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* GERARDO MERCED JIMÉNEZ, acusado y apelante.

*Número:* CR-71-40     *Resuelto:* 29 de noviembre de 1971

*Hjalmar Flax,* abogado del apelante; *Gilberto Gierbolini, Procurador General,* y *Juan E. Brunet, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

Un jurado declaró culpable al acusado-apelante de los delitos de Asesinato en Primer Grado e Infracción al Art. 8 de la Ley de Armas. El veredicto fue por mayoría de 9 a 3 en el caso de Asesinato y por unanimidad en el de Ley de Armas. Además fue declarado culpable por tribunal de derecho de una infracción al Art. 6 de la referida Ley de Armas.

En este recurso señala como errores, 1) la negativa del juez sentenciador a transmitir al jurado, según lo solicitó la defensa, instrucciones sobre defensa propia, 2) nulidad del veredicto porque la prueba no estableció todos los elementos del delito de asesinato en primer grado, y 3) nulidad del veredicto rendido por mayoría y no por unanimidad.

La consideración de los dos primeros errores requiere un examen de la prueba. El resumen que de la misma hace correctamente el Procurador General en su Informe, es como sigue:

"Los hechos de este caso ocurrieron en o alrededor de las once y treinta de la noche del día 15 de marzo de 1969 en un barrio de Bayamón. José Belén Olivo Jiménez declaró que el día de los hechos se encontraba en compañía del occiso, Pablo Rivera Vázquez, y de otros amigos en el bar de Ángel Huertas. A eso de las seis de la tarde salieron de allí y se dirigieron al negocio de una tal doña Virí. Como a las siete de la noche fueron al bar Raymond. (T.E. págs. 10–12) Al llegar se encontraron con varias personas entre las cuales estaba el acusado-apelante. (T.E. pág. 14) El testigo y sus acompañantes le estrecharon la mano al acusado-apelante. En eso surgió un incidente ya que éste alegó que el occiso le había apretado fuertemente la mano. (T.E. págs. 15–16) Posteriormente el testigo y sus acompañantes, entre los cuales se encontraba el occiso, se marcharon del lugar y fueron al bar Green Village en donde permanecieron por espacio de dos horas. (T.E. pág. 17) El testigo y sus acompañantes decidieron regresar a sus hogares ya que era tarde. En el viaje de regreso y al pasar frente al bar de Raymond el testigo vio que su padre se encontraba en el negocio. Entraron por segunda ocasión al mismo. (T.E. págs. 17–18) El testigo vio a su padre conversando con el acusado-apelante quien tenía una herida en la mano izquierda aparente-

mente causada por una bala. (T.E. págs. 19–20) El padre del testigo pidió un trago para echárselo en la herida al acusado-apelante, pero éste manifestó que le caía mejor si se lo tomaba. Surgió entonces una discusión entre el acusado-apelante y otra persona conocida por el Cano que intentó auxiliarlo. El acusado-apelante manifestó que no quería ayuda de nadie y comenzó a proferir palabras obscenas contra algunas de las personas que estaban presentes. (T.E. págs. 20–21) El padre del testigo volvió a hablar con el acusado-apelante y éste se calmó. (T.E. págs. 21–23) Momentos después volvió el acusado-apelante a proferir insultos primero contra el testigo y después contra sus acompañantes que se encontraban detrás de la barra. El occiso fue al baño y al regresar se encontró que la discusión continuaba. (T.E. págs. 23–25) El acusado-apelante continuó profiriendo obscenidades contra el testigo y sus acompañantes. Al repetir una frase ofensiva contra el grupo el occiso se dirigió hacia él y le dio un puñetazo que lo tiró al suelo. Procedió a levantarlo y fue disuadido por el testigo de continuar la pelea. (T.E. págs. 26–27) El testigo logró que el occiso saliese fuera del negocio. A instancias del dueño del negocio el acusado-apelante también salió afuera. Estando fuera del negocio y mientras el occiso se retiraba el acusado-apelante lo llamó y le preguntó que por qué lo había agredido. A lo que el occiso le respondió que fue por las palabras que utilizó para dirigirse hacia él y a sus acompañantes. Luego de lo cual el acusado-apelante sacó un revólver que portaba en la cintura. El padre del testigo se interpuso entre el occiso y el acusado-apelante a la vez que le decía a aquél que se marchase. El occiso se desabotonó la camisa y se viró los bolsillos para mostrarle al acusado-apelante que no portaba arma alguna. El acusado-apelante le entregó su revólver al occiso y éste se lo devolvió diciéndole 'no, eso no es lo mío'. (T.E. pág. 31) El occiso se retiró para marcharse pero el acusado-apelante lo llamó nuevamente y cuando el occiso se le acercó le hizo un disparo cayendo inmóvil al pavimento. (T.E. pág. 32) Mientras así se encontraba el occiso el acusado-apelante le pegó con los pies y le dio dos veces en la cara. (T.E. pág. 32) Dijo el testigo que trató de socorrer al occiso pero el acusado-apelante lo encañonó con el revólver. El padre del testigo empujó al acusado-apelante y entonces uno de los acompañantes del testigo de nombre Valentín, agarró un pedazo de bambú y comenzó a agredir al acusado-apelante hasta que éste soltó el revólver que tenía en la mano. (T.E. págs.

33–36) El testigo y otras personas levantaron al herido del suelo, lo metieron en un automóvil y lo condujeron al hospital de Bayamón de donde fue enviado en una ambulancia al Centro Médico falleciendo en el camino. (T.E. pág. 40)

Siguió relatando Olivo Jiménez que en el camino hacia el Hospital de Bayamón su acompañante Valentín quien le había quitado al acusado-apelante el revólver, lo tiró por frente a la entrada del Cementerio Nacional. (T.E. págs. 39–40) El testigo identificó en el juicio el revólver que se le mostró como aquél que le había visto al acusado-apelante (T.E. pág. 38), y que posteriormente recogieron de donde lo habían tirado. (T.E. pág. 41) Olivo Jiménez fue extensamente contrainterrogado y sostuvo todo cuanto había relatado en el examen directo.

El doctor Néstor Loynaz declaró ser médico patólogo. Trabajaba en el Instituto de Medicina Legal. Declaró que el día 16 de marzo de 1969 le practicó la autopsia al cadáver de Pablo Rivera Vázquez. Como resultado de esa autopsia encontró que el occiso falleció a causa de una herida de bala, la cual había penetrado a unas cinco pulgadas por encima del ombligo, habiendo mantenido una trayectoria casi horizontal, perforando el hígado así como la arteria aorta. Como resultado de esa perforación había ocurrido un 'sangramiento agudo'. (T.E. pág. 53) Asimismo declaró el testigo que en una situación como ésta la persona fallece en pocos minutos. (T.E. págs. 51–53) El análisis de la sangre del occiso dio un resultado de .14% de alcohol. (T.E. pág. 54) El médico identificó el plomo que obtuvo del cadáver examinado.

En el contrainterrogatorio el testigo sostuvo lo dicho en el directo. En contestación a una pregunta de la defensa sobre si el acusado-apelante pudo haber hecho el disparo desde el suelo estando la víctima de pie, respondió en la negativa. (T.E. pág. 62)

Eleuterio García García declaró que el día de los hechos mientras él se encontraba en el bar de Raymond, el acusado-apelante le pasó por el lado y se le quedó mirando. Allí mismo comenzó a proferir palabras obscenas contra él sin haber mediado provocación alguna.

El detective Luis A. Figueroa declaró que el doctor Loynaz le había entregado un sobre que contenía un plomo que lo llevó al Laboratorio de la Policía y posteriormente el químico se lo devolvió y él lo entregó a la fiscalía. (T.E. págs. 95–96)

En el contrainterrogatorio manifestó que se persónó al Centro Médico según órdenes que recibió. Allí vio el cadáver en la sección de Emergencia. También vio allí al acusado-apelante quién mostraba una herida en el brazo izquierdo y laceraciones en la cabeza. Con referencia a la pistola dijo que fue en compañía de Valentín (Pipo) y encontró la pistola donde éste la había tirado. (T.E. pág. 97)

En el redirecto este testigo identificó el revólver diciendo que era el mismo que él había encontrado. Declaró asimismo que abrieron el revólver y encontraron que tenía dos casquillos. Aseveró que la herida que presentaba el acusado-apelante era en la mano. (T.E. págs. 103–105)

Por la defensa prestaron testimonio el Lic. Fermín Arraiza, José Belén Olivo (padre) y Margarita Rivera de Merced Jiménez, habiéndose estipulado la declaración del policía Marcos López.

El Lic. Fermín Arraiza declaró que había asumido la representación legal del acusado-apelante como a los tres días después de los hechos, a instancias de la esposa de éste. Vio al acusado apelante mientras éste se encontraba en la Cárcel La Princesa. Éste presentaba varias heridas en la cabeza y tenía una mano hinchada con un punto de perforación.

El testigo José Belén Olivo (padre) primero declaró que no recordaba donde había estado el día de los hechos por la noche. Después dijo que esa noche él llegó a un negocio y al entrar vio al acusado-apelante que sangraba por una mano. Habló con éste y después le lavó una mano con whiskey. Allí continuó hablando y tomando con el acusado-apelante. Posteriormente, sin recordar el tiempo que había transcurrido, vino una persona y le dio un puño al acusado-apelante mientras hablaba con el testigo. (T.E. págs. 122–123) La persona que le dio al acusado-apelante fue Pablo Rivera Vázquez conocido por Piliche. (T.E. pág. 124) El testigo dijo que no recordaba si al llegar al negocio ya estaba allí quien le dio al acusado-apelante o si llegó después. También dijo que no recordaba haber visto a su hijo (José Belén) esa noche allí. (T.E. págs. 126–127)

En el contrainterrogatorio el testigo admitió que la noche de los hechos estaba 'borrachito'. (T.E. pág. 127) También admitió que, en términos generales, al día siguiente de haber estado tomando a él se le olvidaban algunas cosas de las que habían sucedido mientras tomaba. (T.E. págs. 128–129) El testigo incurrió en contradicciones y posteriormente se concretó a res-

ponder que él no recordaba absolutamente nada de los incidentes posteriores en el lugar de los hechos. (T.E. págs. 131–140)

Margarita Rivera de Merced Jiménez, la esposa del acusado-apelante, declaró que la noche de los hechos, como a eso de la una y media de la madrugada, le llevaron a su esposo a su casa bastante golpeado. Como a la media hora llegó la policía y lo llevaron al hospital. (T.E. págs. 145–146) Declaró además, que su esposo al salir de su casa no llevaba ningún arma. (T.E. pág. 47)

Se estipuló la declaración que prestaría el policía Marcos López a los efectos de que acudió a la residencia del acusado-apelante. y lo encontró con golpes en la cabeza, en la boca y en la mano izquierda. (T.E. págs. 151–152)" (Informe Procurador General, págs. 1–6.)

Para mayor claridad en la determinación de si en este caso quedaron establecidas la premeditación y la "deliberación", copiamos del récord aquella parte del testimonio del único testigo que relata lo acontecido inmediatamente antes de la víctima recibir el disparo fatal. Veamos:

"P. Perdone, testigo, una pregunta que le voy a hacer, relate el incidente antes de Pablo Rivera pegarle a este señor, de darle a este señor, cómo es?

R. Pablo Rivera se sintió molesto cuando él dijo la palabra esa que dijo.

P. Cuál palabra es?

R. De esos cuatro . . .

P. Diga la palabra?

HON. JUEZ:

De esos cuatro qué, dijo?

HON. FISCAL:

Diga la palabra, testigo. Usted está aquí para decir la verdad lo que usted oyó, diga qué fue lo que dijo, eso de los cuatro qué?

R. Esos cuatro pendejos que están ahí atrás, o sea, que era Pablo, Pipo, Valentín y un servidor, y el hermano mío que estaba.

P. Dígame, testigo, cuántas veces este señor se dirigió al grupo donde usted estaba?

R. Cuando me dijo gorila, cuando . . .

P. No, pero, cuando dijo esos cuatro pendejos que están ahí, volvió a referirse a ustedes?

R. Sí, nos señaló a nosotros, hizo así, esos cuatro.

P. Pero cuántas veces se refirió a ustedes?

R. Dos veces.

P. Y qué pasó en la segunda vez?

R. Entonces, pues, Pablo me dice a mí, 'mira, Belén, a este hombre yo le voy a llamar la atención' y yo le dije 'deja ese muchacho quieto, olvídate, vámonos, y entonces, pues, cuando salió del baño, pues, yo me descuidé y pasó así rápido, una cosa de . . . y entonces le dio y entonces lo metió dentro de la barra, es como una cosita así, lo metió, lo metió por la barra, por el lado de la barra, por donde pasaba la gente para meterse adentro, lo metió para adentro, lo tiró al suelo y entonces, él se levantó.

P. Quién se levantó?

R. Pablo Rivera, verdad, usted sabe, se levantó así y volvió así y lo agarró por aquí y entonces lo levantó al señor y lo ve, lo levantó así y entonces, al levantarlo así, llego yo por la espalda y lo aguanté, le dije, 'Pablo suelta a ese hombre,' entonces, pues, Pablo lo soltó, y le dije, 'Pablo vente, vámonos,' y lo sacamos fuera.

P. Le pregunto, testigo, en ese momento Pablo tenía algo en las manos?

R. No, señor, no tenía nada.

P. Con qué fue que le pegó a este señor?

R. Con el puño le dio.

P. No tenía nada en las manos?

R. No, señor.

P. Y cuando usted se lo lleva, que se va con usted Pablo, lleva algo en las manos?

R. Nada, tampoco.

P. Siga relatando.

R. Entonces, el dueño del negocio, al ver la acción de nosotros, pues, dijo, si es problema, sálganse afuera y entonces, pues, sacamos a Pablo y yo le dije a Pablo, vámonos y entonces Pablo dijo, me voy, y entonces, pues, el caballero en eso se levantó, y entonces, cogió el sombrero, levantó el sombrero, y me pasó el sombrero a mí y entonces yo vine y le pasé el sombrero del caballero a Ramón, Ramón no lo quiso coger y lo puso así en el mostrador en la barra.

P. Y cuándo fue que le pasó el sombrero allí?

R. El caballero levantó el sombrero.

P. Y ese sombrero . . .

HON. JUEZ:

Hágase constar que cuando dice caballero, señala al acusado.

HON. FISCAL:

P. Siga.

R. Entonces, pues, sacamos a Pablo afuera, y entonces, pues, cuando sacamos a Pablo afuera, ya el caballero está en pie y entonces nos lo llevamos, y entonces, pues, el caballero cuando Pablo se está retirando, lo llama y le dice, 'por qué tú me distes', y entonces, pues, Pablo le dijo, yo te dí un cantazo porque tú dijistes que esos cuatro . . . y nosotros no somos ninguno de esos cuatro, lo que tú dijistes ahí, tú nos llamaste esos cuatro desos, y nosotros no somos ninguno de esos cuatro desos, y entonces, pues, este, no había más intercambio de palabra, sino el por qué me distes, y entonces Pablo dijo, 'vuelvo y te lo digo, porque tu nos dijistes eso', y en eso el caballero, . . . yo estoy afuera, en la puerta que está aquí, y entonces acá afuera yo estoy así, y entonces el caballero cuando sale, cuando sale el caballero, hace así cuando sale, verdad, que hay como una especie . . .

HON. JUEZ:

Qué caballero?

TESTIGO:

El acusado, y entonces cuando sale, hizo así verdad, y entonces cuando hizo así, verdad tenía una pistola aquí, o sea, era una . . . tenía como unas tapas blancas, le vi tapas y entonces hizo así, y entonces cuando hizo así, se le vio aquí, y entonces yo le dije a mi amigo, le dije 'mira, ese hombre tiene un revólver' y entonces, pues, el muchacho . . . entonces mi padre se metió por el medio y me dijo, 'vente vámonos,' y a Piri.

P. Cuando usted dice Piri, a quién se refiere?

R. Al muerto, a Pablo Rivera. Entonces, pues, entonces cuando el señor Gerardo Merced sale así, que entonces sacó el revólver, verdad, que ya habían intercambiado palabras y entonces saca el revólver, entonces le hizo así para atrás, le hizo como así, como que había algo, usted sabe, atrás, o sea, yo sé que había como una separación, una cosa así, y entonces lo tiene así, y entonces Pirichi le dijo . . . se desabrochó la camisa y le dijo, y le dijo, 'mira, yo . . . eso no es lo mío, yo ando sin nada,' y le sacó el bolsillo y entonces le dijo, bueno, pero por qué me dices eso, bueno, y entonces el caballero coge el revólver, lo coge

así, por el cañón . . . hágame el favor, puede venir alguien aquí . . . y entonces cogió el revólver así por el cañón, y entonces, y lo cogió y le dijo, 'toma', le dijo a Pirichi, entonces, Pirichi, eso no es . . .

P. Qué fue lo que le dio?

R. El revólver, con dos tapas blancas, y entonces Pirichi le dijo, 'no, eso no es lo mío.'

HON. JUEZ:

P. Cómo le decían?

R. Piri, Pirichi . . .

P. Adelante.

HON. FISCAL:

P. Siga.

TESTIGO:

R. Y entonces volvió y le dijo, mira, eso no es lo mío, y le puso el revólver de nuevo en la mano a él.

P. Cuando usted dice a él, a quién se refiere?

R. Al caballero, a Gerardo Merced. Y entonces pues, ahí mi padre interviene, y entonces se mete entremedio de los dos que están más o menos a una separación, así, mi padre se mete como es grande, y agarra y le dice a Piri, 'vente Piri,' y se lo llevó, y entonces, ya van de . . . como de aquí a la puerta, una distancia más o menos de aquí a la puerta, como cuarenta pies, y entonces el caballero lo llama, 'pero Pirichi, ven acá, y entonces cuando Pablo regresa, él tiene el revólver en la mano, así, entonces Pablo le dijo, 'qué es lo que tú quieres, y le digo, entonces pues, el caballero le tiró, o sea, él estaba así parado, y tenía el revólver aquí, y le hizo así, le tiró, le hizo así, 'Raaa', y le tiró.

HON. FISCAL:

Para fines de récord, que el testigo se pega la mano a la cintura, mostrando hacia el frente, apuntando hacia el frente y le tiró.

P. Oiga, y cuando usted dice le tiró, qué fue lo que le tiró?

R. Le pegó un tiro.

P. Por qué usted sabe que le pegó un tiro?

R. Bueno, o sea, cuando el tiro, se vio el humo, y entonces Piri, como que eso, que que es una cosa como si le soltaran . . . él cayó ahí mismo como si fuera algo así como un montoncito y cayó patas arriba.

P. Y cuando Piri regresa, qué le pregunta, 'qué tú quieres conmigo', Piri tenía algo en las manos?

R. Nada.

P. Le pregunto si Piri habló malo del señor, o a él?

R. No, señor, en ningún momento.

P. Le pregunto si Piri agredió a este señor cuando este señor le dio el disparo en ese momento?

R. No, señor, y entonces le disparó, que le metió el tiro, Piri estaba en el suelo, él vino y le dio con el pie y entonces le dio en la cara así dos veces, que le viró la cara y entonces mi padre se fue a meter y cuando él se fue a meter, yo llegué y lo agarré por el brazo derecho, así mismo lo agarré, todavía el caballero tenía la pistola, y cuando yo agarré a mi padre, entonces me empujó y entonces cuando mi padre se metió, pues, vino y lo encañonó, y entonces cuando encañonó a mi padre, y como mi padre tiene la barriga bien grande, tenía el frente así, y mi padre le dijo, 'ya lo matastes, lo matastes, eso era lo que tú querías, lo matastes', y mi padre sacó el 'switch', y entonces, en esa discusión, en el intercambio ese, que mi padre también lo empujó, y entonces ahí él quedó un poquito sosegado, y entonces, pasó así, y entonces Pipo agarró una bambúa y le dio un cantazo." (T.E., primera pieza, págs. 26 a 33).

Siempre que la prueba lo justifique el juez debe instruir al jurado sobre todos los puntos de derecho que bajo cualquier teoría razonable puedan estar envueltos en sus deliberaciones. *Pueblo* v. *Del Valle*, 91 D.P.R. 174, 180 (1964); *Pueblo* v. *Burgos*, 76 D.P.R. 199 (1954); *Pueblo* v. *Jiménez*, 78 D.P.R. 7 (1955); *Pueblo* v. *Tufiño Cruz*, 96 D.P.R. 225, 230 (1968).

En el presente caso no hay prueba que justifique unas instrucciones sobre defensa propia. El acusado-apelante no estaba siendo atacado cuando hizo el disparo fatal a la víctima, ni su vida o seguridad personal estaban en riesgo inminente. El acusado sabía que la víctima no portaba armas sobre su persona y que ya se retiraba del lugar cuando es llamado nuevamente por el acusado y al aquél acercarse le hace el disparo que le privó de la vida a la víctima.

Una posible alusión a la defensa propia la hizo el abogado del apelante al exponer su teoría al jurado. La teo-

ría del caso no tiene valor probatorio alguno. *Pueblo* v. *Calderón Rodríguez*, 97 D.P.R. 261 (1969) ; *Pueblo* v. *Hernández Santiago*, 97 D.P.R. 522 (1969). En su consecuencia fue correcta la negativa del juez a transmitir al jurado instrucciones sobre la defensa propia.

El jurado tuvo ante sí prueba suficiente para rendir un veredicto declarando al acusado culpable de asesinato en primer grado. Una de las modalidades de este delito la constituye toda clase de muerte alevosa, deliberada y premeditada. Art. 201 del Código Penal (33 L.P.R.A. sec. 633). El acusado no disparó a la víctima sin malicia, ni en un arrebato de cólera o súbita pendencia. Cuando el acusado fue agredido por Pablo Rivera Vázquez, luego de aquél haber proferido palabras insultantes contra Rivera y sus amigos, intervinieron otras personas y los separaron. No es en ese momento en que el acusado hace el disparo fatal. De haber sido así la muerte de Rivera hubiera ocurrido con motivo de una súbita pendencia y tal vez de un arrebato de cólera. Los amigos de Rivera lo llevan fuera del bar aconsejándole que se marchase a su casa, a lo que accede. Sale también afuera el acusado y dirigiéndose a Rivera, quien ya se retiraba, lo llama y le pregunta porque lo había agredido contestándole aquél que fue "por las palabras que nos dirigió, por la ofensa que nos dirigiste a nosotros." El acusado saca un revólver de su cintura, y Rivera, desabrochándose la camisa y vaciándose el bolsillo le dijo que eso no era lo de él, que andaba sin nada. Entonces el acusado le dio el revólver a Rivera pero éste se lo devolvió diciéndole "no, eso no es lo mío". Se interpone entre ellos el padre de José Belén Olivo y le dice a Rivera, "vente Piri" y se lo llevó. Cuando se van retirando vuelve el acusado a llamar a Rivera y cuando éste le pregunta "que es lo que tú quieres", el acusado inmediatamente le hace un disparo de revólver y Rivera cae al suelo mortalmente herido. Entonces el acusado se le acerca y en el suelo le da un puntapié y le golpea dos veces en la cara.

■ Aunque no transcurrió mucho tiempo entre el intercambio de palabras del acusado con Rivera y el momento en que éste cae herido de muerte, los hechos son suficientes para inferir de ellos que el acusado premeditó y deliberó dar muerte al occiso. La ley no requiere un determinado espacio de tiempo para la deliberación y premeditación necesarias para una convicción de asesinato en primer grado. Pueden existir y concebirse en el momento mismo de la realización del ataque. *Pueblo* v. *Román,* 70 D.P.R. 50, 54 (1949).

. "La deliberación es la resolución o decisión de matar, después de darle alguna consideración; pero cualquier período de tiempo, por corto que sea, es suficiente para que pueda tener lugar la deliberación. Ese lapso, sostienen las autoridades, puede ser tan rápido como el pensamiento." *Pueblo* v. *Rosario,* 67 D.P.R. 371, 375.

■ La presencia o ausencia de deliberación es una cuestión de hecho a ser resuelta por el jurado, *Pueblo* v. *Barriera González,* 89 D.P.R. 772, 776 (1964); y en este caso el jurado resolvió correctamente que la muerte de Rivera fue el resultado del pensamiento calculador, premeditado y deliberado del acusado. Siendo la deliberación un acto subjetivo del acusado es preciso recurrir a los hechos del caso para determinar si de ellos puede racionalmente inferirse la deliberación. *Pueblo* v. *Blanco,* 77 D.P.R. 767, 774 (1954). Es difícil sostener que el jurado, a quien corresponde decidir sobre la ausencia o presencia de deliberación, no tenía base en los hechos para inferir racionalmente que el acusado dio muerte a Rivera con malicia, premeditación y deliberación. No debemos intervenir con su veredicto.

■ La cuestión referente a la nulidad del veredicto por no ser unánime, ha sido ya resuelta en contra del apelante. *Pueblo* v. *Rivera Ríos,* Cr-70-136, Sentencia de 25 de marzo de 1971.

*Se confirmarán las sentencias apeladas.*

El Juez Presidente, Señor Negrón Fernández y los Jueces

Asociados, Señores Hernández Matos y Torres Rigual, no intervinieron.