EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* WILFREDO HERNÁNDEZ SANTIAGO, acusado y apelante.

*Número:* CR-68-179          *Resuelto:* 27 de junio de 1969

*Yamil Galib Frangie* y *Luis E. Negrón Lizardi,* abogados del apelante; *J. F. Rodríguez Rivera, Procurador General Interino,* y *Américo Serra, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

El apelante, Wilfredo Hernández Santiago, fue acusado y convicto de asesinato en primer grado. En 5 de enero de 1967 fue condenado a cumplir la pena de reclusión perpetua.

Sus 14 apuntamientos se basan en (1) la conducta impropia del fiscal; (2) la no admisión de la grabación realizada por la defensa del testimonio prestado por testigos en la vista preliminar; (3) la admisión de prueba de delitos anteriores del apelante; (4) la denegación de una moción de disolución del jurado (*mistrial*); (5) errores en las instrucciones al jurado; (6) errores del jurado en la apreciación de la prueba; (7) la negación de nuevo juicio; y en (8) no aparecer del récord que el veredicto fuese aceptado por

el tribunal de instancia ni que la sentencia dictada correspondiese al veredicto.

No tiene razón, por las razones que a continuación relacionamos.

### Relación de la Prueba

Los siguientes hechos, relacionados por el Procurador General, aparecen sostenidos por la prueba.

"Allá para el mes de junio del año 1965, en el Barrio Bartolo de Lares, el acusado tuvo un altercado con el Sr. Manuel Soto, padre del interfecto Pablo Soto, en relación con un deslinde que se estaba practicando entre la parcela del Sr. Soto y la finca del acusado. [En esa ocasión el acusado le dio al Sr. Soto con un machete produciéndole una herida en un brazo.] Para el mes de agosto de 1965 hubo otra controversia, esta vez entre el acusado y el interfecto Pablo Soto imputándole aquél a éste que había insultado a su esposa. Se celebró un juicio contra Pablo Soto en relación con estas imputaciones, saliendo éste absuelto. Al salir del tribunal, el acusado le dijo a Pablo Soto que 'estaba bien, que él iba a salir absuelto, pero que él lo arreglaba.' En los primeros días del mes de septiembre de 1965, el acusado le manifestó al testigo Eugenio Vélez Lajara que le iba a dar una paliza a Pablo Soto.

El jueves, 30 de septiembre de 1965, Pablo Soto salió de su casa en horas del mediodía a llevarle el almuerzo a su hermano Edelmiro Soto. Ese día Pablo Soto iba calzando botas negras de goma partidas a la altura del tobillo. El testigo Vélez Lajara vio pasar a Soto hacia la carretera embreada, pocos minutos antes de las doce del mediodía. Varios testigos vieron al acusado ese día subir solo en un *jeep* hacia la finca 'Arbona' como a las 12 y media de la tarde. El testigo Luis Angel Ramos Desardén observó que el acusado llevaba en el *jeep* un bulto negro, unos palos largos y unos 'cantos de botas' color negro cortadas al tobillo. Otro testigo de cargo, Romualdo Caraballo, notó que el acusado llevaba dentro del *jeep* una colchoneta color ceniza o negra y dos palos. Este testigo expresó que la colchoneta era del mismo color que la del bulto en que encontraron al interfecto. El acusado vestía camisa cuando subió a mediodía hacia la finca. De dos a dos y media de la tarde fue visto bajar

en el *jeep* acompañado de Luis Morales. En esta ocasión el acusado no tenía camisa puesta. El testigo Vélez Lajara observó que ese día por la mañana el acusado vestía ropa sucia, y que al volverlo a ver a las dos y media de la tarde estaba limpio.

Al día siguiente, viernes 1ro. de octubre de 1965, Ramón Ramos Desardén se encontraba trabajando en la finca 'Arbona', propiedad del padre del acusado. Como de dos a dos y media de la tarde salió a buscar guineos maduros por una vereda, cuando observó que el acusado, desnudo de la cintura para arriba, cargaba un bulto en el hombro, y que 'lo tiró en una zanja que había y lo tapó con cantos de palo y matas de guineo'. Al irse del lugar el acusado, Ramos Desardén, que se encontraba escondido, se acercó al sitio donde el acusado había escondido el bulto y observó que había la mitad de un ser humano, desde la cintura hasta el cuello, envuelto y amarrado en una colchoneta color ceniza. Después que vio el bulto, el testigo lo tapó y lo dejó como el acusado lo había puesto.

El sábado 2 de octubre de 1965, en horas de la mañana, el acusado ordenó a varios de sus empleados que desyerbaran y talaran árboles de café y matas de guineo cerca del sitio donde apareció luego el cadáver de Pablo Soto. Luis Angel Ramos Desardén se encontró con el acusado y éste lo amenazó 'porque él había sabido que yo había dicho que él subía un bulto'. A las dos de la tarde de ese día, el acusado fue, acompañado por sus empleados, Carlos Vega Ferrer y Luis Morales, a buscar una 'puerca' o máquina para hacer caminos a la casa del Sr. Tomás Molini en el Barrio Indiera Alta de Maricao. Ese mismo día el acusado se llevó la 'puerca' o 'tractor' a la finca Arbona y comenzó a abrir un camino 'a la parte arriba donde se encontró el cadáver'.

El domingo 3 de octubre, el acusado llegó al Barrio Bartolo 'con ropa puesta llena de sucio, llena de tierra colorada'. La policía, que desde el día 1ro. de octubre ya estaba investigando la desaparición de Pablo Soto, sospechó que el acusado estaba trabajando ese domingo y fueron dos policías a la Hacienda Arbona. Allí encontraron la 'puerca' de hacer carreteras y notaron que ese día el acusado había hecho un camino de un kilómetro de largo. A los policías les extrañó que para hacer aquel camino 'habían destruído una pieza de café bastante hermosa que estaba al punto de madurar el café'. En un sitio donde habían abierto una curva, había una zanja en la parte

de abajo y 'habían tapado la zanja'. Como a las cinco de la tarde de ese día, encontraron un papel plástico, 'de cellophane,' que apestaba muchísimo y que estaba podrido. Le pusieron un pedazo de palo encima y fueron a buscar una bolsa para echarlo, pero cuando regresaron a la media hora el papel había desaparecido.

El martes 5 de octubre la policía consiguió varios obreros para que ayudaran a cavar. Pidieron autorización para cavar al señor Andeliz Hernández, padre del acusado, y éste les dijo que podían cavar allí, que no había problemas. Ese día cavaron hasta las cinco de la tarde. El acusado llegó allí ese día y les preguntó qué hacían allí, y les dijo que si cavaban allí, tenían que dejar luego el sitio como estaba antes.

En la mañana del miércoles 6 de octubre, mientras la policía continuaba la búsqueda, el acusado fue a la casa de Palmira Santiago, esposa de un empleado del padre del acusado, y le dijo a ésta que si la policía preguntaba por él dijera 'que eso habían sido los Desardenes'; que si la policía le preguntaba 'del delito que había pasado, que habían matado a Pablo', que dijera que 'eso habían sido los Desardenes'.

La policía prosiguió la búsqueda durante el resto de esa semana, y el domingo 10 de octubre consiguieron una pala mecánica prestada. Ese domingo apareció un bulto con un corazón y costillas, que apestaba mucho, envuelto en una colchoneta de cargar guineos y amarrado con una soga. Mientras la policía cavaba, el acusado venía tapando el camino y los 'obligó a coger por arriba'. Pudieron pasar por el camino cuando subió el 'loader' y le pidieron al acusado que destapara el camino para pasar la máquina ese día.

El lunes 11 de octubre, la policía fue al mismo sitio en la 'patrol' y, debido a que había llovido, este vehículo 'se metió en una zanja que se había formado y patinó y pasó al otro lado y salió una peste tremenda'. Allí observaron mucho pelo y huesos y encontraron un saco conteniendo una cabeza humana y dos pedazos de brazos. La capota de la 'puerca' del acusado se encontraba a la orilla del camino, en el sitio donde habían empezado a cavar por primera vez. El acusado les dijo que 'no se le moviera nada porque era un punto que tenía', pero ellos echaron a un lado la capota y el cadáver 'apareció en esa misma dirección'.

Como a tres o cuatro hectómetros de donde apareció el cadáver, la policía encontró ropa quemada que apestaba a gasolina y observaron huellas de zapatos militares.

El cadáver descuartizado fue identificado como el de Pablo Soto Acevedo por su hermano Edelmiro Soto."

*Análisis y Disposición de los Apuntamientos*

I.—Conducta impropia del fiscal.

(a) La defensa arguye que "Al exponer su teoría al Jurado el Ministerio Público hizo ofrecimiento de que habría de probar hechos con el testimonio de Luis Morales Quirós cuya negativa a declarar sobre los mismos y hostilidad era conocida por los Fiscales desde hacía más de un año, específicamente desde la celebración de la vista preliminar del caso . . . . Esta situación se evidencia más claramente en la discusión que más adelante hacemos del segundo [apuntamiento] y que tiene que ver con la decisión del Hon. Tribunal sentenciador permitiendo a los Fiscales ofrecer en evidencia las declaraciones prestadas a ellos por dicho testigo en el curso de la investigación del caso a los fines de impugnar dicho testigo." Informa la defensa que no se trata de la situación contemplada en *Pueblo* v. *Fournier*, 80 D.P.R. 390 (1958), y de *Pueblo* v. *Díaz*, 74 D.P.R. 375 (1953), pues el fiscal no estaba actuando de buena fe sino a sabiendas que estaba ofreciendo una prueba con la cual no contaba; que para esa situación es de aplicación el caso de *Pueblo* v. *Marchand Paz*, 53 D.P.R. 671, 683 (1938).

El fiscal hizo referencia en la exposición de su teoría del caso a que el día de los hechos el acusado llevó al testigo Luis Morales Quirós cerca de su casa y le instruyó para que desyerbara a la orilla del camino por donde pasaba la víctima, y que al desyerbar allí Morales Quirós encontró arroz y el acusado le dijo que ese era el almuerzo del carpintero que se le había perdido. Además, el fiscal manifestó que cuando el acusado subió para la finca Arbona iba con camisa

puesta, pero que cuando llegó donde Luis Morales Quirós no tenía camisa. Es correcto y ajustado a derecho que el ministerio público se refiera en su teoría a prueba que está en su poder en declaraciones juradas prestadas por testigos durante la investigación original del caso. El hecho de que en una vista preliminar celebrada más de un año antes del juicio el testigo se negara a declarar, no es indicio alguno de que se supiera de antemano que durante el juicio iba a hacer lo mismo. Tan es así, que en la vista del juicio el testigo Morales Quirós repitió gran parte de su declaración original, aunque no recordó los referidos hechos.

Luego de testificar Morales Quirós que no recordaba tales hechos, fue confrontado con la relación de los mismos en sus declaraciones juradas y se reafirmó en no recordarlos. El tribunal de instancia admitió las declaraciones al único fin de impugnar la credibilidad del testigo y a esos efectos instruyó al jurado advirtiéndole que no debían considerar como prueba el contenido de las mismas. Tal actuación no fue errónea. *Pueblo* v. *Verdejo Meléndez*, 88 D.P.R. 207, 217, 218 (1963) ; *Pueblo* v. *Zayas*, 72 D.P.R. 18, 21, 22 (1951). Actuó de buena fe el Fiscal pues tenía en su poder declaraciones juradas de este testigo donde se aseveraba por éste lo que el fiscal expresó en su teoría. No es de aplicación el caso de *Pueblo* v. *Marchand Paz*, supra, pues lo que allí se dice al respecto es que la prueba de impugnación no es admisible para contribuir a presentar un caso positivo en favor del Pueblo. Obsérvese, además, que, por el contrario, en el caso ante nos, el tribunal instruyó debidamente al jurado sobre el propósito y alcance de la teoría del fiscal, expresando que dicha teoría "no constituye prueba alguna y son ustedes los que determinarán si el Fiscal ha probado los hechos que expuso en su teoría." *Pueblo* v. *Rivera Romero*, 83 D.P.R. 471, 479 (1961) ; *Pueblo* v. *Fournier*, supra.

(b) Alega la defensa que el fiscal incurrió en conducta tumultuosa, impropia y violenta. El incidente en que se basa este apuntamiento fue el siguiente.

■ Mientras el fiscal Vera Mercado interrogaba al acusado, éste dijo que el fiscal Cordero Román había entrado en su casa y en diversas ocasiones había acariciado a su hija de seis años de edad. Entonces el fiscal Cordero Román expresó lo siguiente:

"¡Es mentira! Y me puede meter Su Señoría el castigo que quiera y me puede mandar a la cárcel o al presidio si cree que eso es verdad." (T.E., 2da. pieza, pág. 440.)

Luego del juez amonestar enérgicamente al fiscal, se decretó un receso a petición de la defensa. El acusado solicitó entonces que se decretara la disolución del jurado (*mistrial*) pero dicha solicitud fue declarada sin lugar por el tribunal. Al regresar el jurado a Sala, el juez de instancia le instruyó inmediatamente que las declaraciones del fiscal y de los abogados de las partes no constituyen prueba alguna y específicamente las anteriores del fiscal; que "Juzgaran el caso por lo que han dicho los testigos y la prueba documental que se ofrezca". Por otra parte el fiscal admitió que no debió haberse manifestado como lo hizo, se excusó ante el jurado y le pidió que al deliberar sobre el caso borrasen de su mente el incidente y cualquier impresión que le hubiere causado.

Como dijimos en *Rivera Romero*, supra, no podemos presumir que los jurados sean personas de sensibilidad extrema, que el menor contacto con cualquier incidente, en casos de asesinato o de cualquier otro delito que estén juzgando, le afecte su ánimo en tal forma que le impida rendir un veredicto imparcial.

■ (c) Se queja el apelante de que el fiscal llamó la atención del jurado mediante preguntas irrelevantes de que en la Sala del tribunal no se encontraban presentes como

expectadores el padre, la madre, la esposa, ni el hermano del acusado.

A preguntas del fiscal, la testigo Juanita Soto, hermana de la víctima, dijo que conocía a esos familiares del acusado pero que no los veía en Sala.

Aparte de que la defensa no objetó en momento alguno las preguntas del fiscal, no vemos en qué forma este incidente pudo lesionar los derechos del acusado en forma tal que le privara de un juicio justo e imparcial. Como expresamos anteriormente no podemos presumir que el jurado sea tan susceptible que cualquier cosa lo pueda afectar en forma tal que no pueda rendir un veredicto justo e imparcial. *Pueblo* v. *Andrades González*, 83 D.P.R. 849 (1961) ; *Pueblo* v. *Rivera Romero*, supra.

(d) Alega el apelante que el fiscal intentó mediante el empleo de inuendos crear la sospecha en la mente del jurado de que hubiese podido haber, como móvil de la comisión de los hechos, algún problema familiar entre el acusado y su esposa por razón del interfecto.

Se basa sólo en una pregunta del fiscal a un testigo hermano de la esposa del apelante de si en septiembre se discutió un asunto de familia en casa de su padre relacionado con el occiso. El fiscal retiró la pregunta. En ningún momento hizo referencia el fiscal a problemas entre el apelante y su esposa por razón del interfecto. Con respecto a las manifestaciones que hiciera el fiscal en su turno de rectificación sobre tales extremos, objetadas que fueron, el juez instruyó al jurado que:

"No deben tomar para nada en consideración las últimas palabras relacionadas con la relación que pueda haber de la vista de la Alteración de la Paz y la relación que pueda haber entre el miembro que se cortó al ser humano y la Alteración a la Paz sobre la esposa del acusado. Sobre esos extremos no tomarán esas manifestaciones en consideración. Las borrarán de sus mentes y harán caso omiso de ellas."

(e), (f), (g) Se queja el apelante que el fiscal, a los fines de establecer un móvil, pretendió presentar prueba de referencia de que el apelante con anterioridad a los hechos del caso había agredido al padre del occiso por razón de una discusión de una guardarraya; que esta situación se agravó al informar el fiscal al jurado que un hombre corpulento como el acusado "le da un cantazo a Don Pablo y en la forma en que le da el cantazo se dispara cualquier maroma y que un hombre así es capaz de cualquier cosa." Arguye, además, que fue conducta impropia del fiscal llamar "asesino" al apelante a la vez que le apuntaba con su dedo, hecho admitido por el fiscal.

■ Sólo uno de dos de los testigos no presenció el encuentro entre el apelante y el padre del occiso. El tribunal ordenó la eliminación de ese testimonio. El otro fue testigo presencial. Además, el propio apelante admitió el encuentro y que le dio con el machete al referido señor. *Pueblo* v. *Martínez Lucena*, 92 D.P.R. 881, 883 (1965). El juez instruyó al jurado sobre este particular en la siguiente forma:

". . . el acusado tiene derecho a ser juzgado con respecto al caso que se menciona en la acusación que les dije anteriormente y no sobre la base de otros delitos cometidos por el acusado si alguno. Esa prueba sobre otros delitos cometidos por el acusado, que se presentó en este caso se admite únicamente para demostrar el móvil o designio, pero el Tribunal les instruye que el acusado es juzgado por el delito de Asesinato en Primer Grado y no por aquellos delitos . . . ."

Los comentarios del fiscal al jurado al margen del incidente de la agresión al padre del occiso no son ilícitos aunque puedan ser improbables, ilógicos, erróneos o absurdos. *Fournier*, supra, pág. 407.

■ En cuanto al epíteto de "asesino", del récord aparece que el juez de instancia inmediatamente amonestó al fiscal advirtiéndole que no debería hacer referencia en adelante al apelante en esa forma. El hecho de que en una ocasión

durante los informes al jurado el fiscal usara ese epíteto no es indicio de que se perjudicaran los derechos sustanciales del acusado ni de que el veredicto estuviera influenciado por el uso de tal lenguaje.

■ (h) Apunta el apelante que el fiscal exacerbó el ánimo del jurado en contra del apelante al hacer contrastes entre la solvencia económica de éste y la pobreza del interfecto, haciendo referencia a "amos", "potentados", "ricos", "pobres", "arruinados", y de que la justicia también se había hecho para los ricos. El tribunal de instancia declaró sin lugar la objeción por entender que el fiscal puede hacer inferencia de la prueba que hay en el récord de lo que el apelante cultivaba. Hubo también prueba de que familiares del occiso y otros testigos eran trabajadores agrícolas. Como dijimos en *Pueblo* v. *Fournier*, supra, págs. 408–409 ". . . Tanto el representante del ministerio público como el abogado de la defensa pueden usar imágenes oratorias, literarias o poéticas y hasta ciertas vituperaciones o invectivas no constituyen necesariamente conducta impropia . . . . Aun suponiendo que el fiscal hizo manifestaciones impropias en su discurso, no procede una revocación a menos que se pruebe que ocasionaron perjuicio a los derechos sustanciales del acusado, es decir, que el veredicto fue influenciado por esa conducta impropia." En tal virtud entendemos que el apuntamiento es inmeritorio.

■ (i) Se alega que durante el contrainterrogatorio del apelante el fiscal dio palmetazos sobre el escritorio del taquígrafo, lo cual violó los derechos de acusado. El incidente no tiene la importancia que pretende darle el apelante. El juez le llamó la atención al fiscal y le advirtió que no iba a permitir que siguiera golpeando la mesa. Obviamente el incidente no pudo tener el efecto de lesionar el derecho del acusado a un juicio justo e imparcial.

(j) El apelante se queja de que el fiscal le preguntó en contrainterrogatorio si era o no cierto que él había botado a los fiscales de su finca el día antes de comenzar el juicio. Como el tribunal de instancia declaró con lugar la objeción de la defensa a dicha pregunta y a instancia de ésta instruyó al jurado que "haga caso omiso de eso" no aparece que el incidente perjudicara al apelante en forma alguna.

(k) Arguye la defensa que los fiscales faltaron a su deber de revelar evidencia favorable al apelante consistente de una grabación magnetofónica tomada por la defensa durante la vista preliminar del testimonio del testigo de cargo Ramón Ramos Desardén. Convenimos con el Procurador General, por los fundamentos relacionados más adelante, que dicha grabación era inadmisible en evidencia.

II. Dispusimos en el párrafo (1) (a) anterior del apuntamiento al efecto de que el tribunal de instancia incidió al admitir en evidencia las declaraciones juradas del testigo Luis Morales Quirós al solo fin de impugnar su testimonio y no como prueba de hechos relacionados en las mismas.

III, IV, V. *Inadmisión de grabación magnetofónica.*

Alega el apelante que al negarse el tribunal a admitir la grabación del testimonio del testigo Ramón Ramos Desardén privó al apelante de confrontarse con testigos contrarios y limitó su derecho a contrainterrogar; que incidió el tribunal al negarse a escuchar la grabación a los. fines de determinar si permitiría (a) su uso en la confrontación del testigo y (b) su admisión en evidencia, y que incidió al negar la admisión de dicha grabación como prueba de la defensa.

▆▆▆▆ Para que estas grabaciones sean admisibles en evidencia deben ser debidamente tomadas, identificadas, y autenticadas como una reproducción fiel y correcta de las manifestaciones proferidas. *State* v. *Mottram*, 184 A.2d 225 (Maine 1962) ; *Commonwealth* v. *Bolish*, 113 A.2d 464 (Penn. 1955). A esos efectos debe demostrarse:

(1) que la máquina grabadora era capaz de tomar el testimonio; (2) que el operador de la máquina era competente para operarla; (3) que la grabación es auténtica y correcta; (4) que no se han hecho cambios, adiciones o eliminaciones a la grabación; (5) la forma en que ha sido conservada la grabación; (6) la identificación de las personas que hablan en la grabación; y (7) que el testimonio se produjo libre y voluntariamente. Véase Anotación: *Admissibility of sound recordings in evidence*, 58 A.L.R.2d 1024, 1027 (1958). El apelante no demostró ninguna de las anteriores circunstancias en o antes de ofrecer la grabación en evidencia. Por el contrario, el fiscal se opuso a base de que fue tomada por un amigo del apelante, tomándose lo que le interesaba a éste.

El propósito de presentar la grabación era impugnar el testimonio del testigo de que el viernes 1ro. de octubre de 1965, mientras trabajaba en la finca del padre del apelante vio a éste cuando tiró un bulto en una zanja y lo tapó con pedazos de palo y matas de guineo y que al irse el testigo se acercó al bulto y vio que había en él el torso de un ser humano envuelto en una colchoneta color ceniza. La impugnación era al efecto que en la vista preliminar observó tales hechos el jueves 30 de septiembre en lugar del viernes 1ro. de octubre de 1965. Denegada la admisión de la grabación solicitó la defensa se citara al fiscal Gil Morales quien había sido el juez que presidió la vista preliminar y anunció que utilizaría como testigo al fiscal Cordero Román quien había participado en dicha vista. Sin embargo, no los utilizó. La defensa tuvo oportunidad de impugnar el referido testigo durante su contrainterrogatorio. El propio apelante testificó que Ramos Desardén dijo en la vista preliminar que presenció los hechos en cuestión el jueves 30 de septiembre de 1965.

Concluimos que el juez de instancia actuó correctamente al denegar la admisión de la grabación que no era una gra-

bación oficial de lo ocurrido en la vista preliminar y además carecía de autenticidad y certeza.

██ VI–VII. Informa el apelante que incidió el tribunal al permitir que el fiscal presentase prueba de alegados delitos anteriores del apelante por voz de testigos que alegaron ser espectadores del juicio de dichos casos.

Un testigo testificó que presenció cuando el apelante le había dado un planazo con un machete al padre del occiso en ocasión de una disputa sobre las colindancias de las fincas de cada uno de ellos y que con tal motivo fue acusado el apelante de acometimiento y agresión. Testificó que "En el caso de Acometimiento y Agresión Grave salió absuelto, no recuerdo bien la otra, pero salió condenado a $500.00." El testimonio en cuestión era admisible pues podía ser demostrativo de motivo. El fiscal expresó al tribunal que el propósito de ofrecer prueba de desavenencias entre el apelante y el interfecto y su familia era el de demostrar motivo o intención de parte del acusado y así lo entendió el tribunal de instancia. Véase cita de su instrucción al efecto relacionada en el apuntamiento I(e) anterior. Hemos dicho que evidencia sobre otros delitos cometidos por el acusado es admisible cuando el delito anterior (a) es un hecho pertinente para establecer la comisión del crimen por el cual se le juzga; (b) forma parte del *res gestae*; (c) puede demostrar motivo, intención, premeditación, malicia o un designio común; o (d) forma parte de la misma transacción. *Pueblo* v. *Martínez Lucena*, supra; *Pueblo* v. *Pimentel Camacho*, 89 D.P.R. 135 (1963); *Pueblo* v. *Aponte González*, 83 D.P.R. 511 (1961); *Pueblo* v. *Fournier*, supra; *Pueblo* v. *Archeval*, 74 D.P.R. 512 (1953). Véase, además, Wharton, *Criminal Evidence*, 12ma. ed., vol. 1, secs. 171 y 173.

VIII. *Denegación de solicitudes sobre disolución del jurado (mistrial)*.

Éstas se produjeron luego de los incidentes discutidos en los apuntamientos I(a), (b) y (j) anteriores en los que

indicamos en efecto que dichos incidentes no tuvieron el efecto de privar al apelante de un juicio justo e imparcial.

■ IX. Objeta el apelante la siguiente instrucción dada al jurado por el tribunal de instancia:

". . . En los casos criminales la Ley presume que el acusado es inocente hasta tanto se le pruebe lo contrario de modo satisfactorio y por evidencia competente; y es regla de ley que su culpabilidad debe ser completamente probada. Esta presunción de inocencia acompaña al acusado durante el juicio y deben tenerla presente en el momento mismo de ustedes entrar a deliberar."

Se basa en que la frase "deben tenerla presente en el momento mismo de ustedes entrar a deliberar" pudo dar al jurado la impresión de que la presunción de inocencia había que desecharla al momento de entrar a deliberar. Considerada esta instrucción dentro del conjunto de las instrucciones claras y precisas que dio al jurado el tribunal de instancia sobre los delitos a considerar, sobre la naturaleza de toda prueba y el peso de la misma, nos parece obvio que el jurado no podía entender la instrucción en cuestión como que la presunción de inocencia acompaña al acusado hasta que el jurado entra a deliberar sino que, necesariamente, el jurado la debe tener presente al entrar a deliberar, es decir, durante todo el proceso de deliberación.

X. Apunta el apelante que incidió el tribunal al denegar las siguientes instrucciones solicitadas por la defensa:

". . . que prueba referente con alegados hechos realizados por el acusado con posterioridad a la muerte de Pablo Soto Acevedo ha sido admitida porque de merecerle crédito esa prueba y encontrarla Uds. establecida más allá de duda razonable, es prueba que sirve para establecer conciencia de culpabilidad del acusado pero esa prueba por sí sola no es suficiente para condenarle del delito imputádole.

. . . que de no merecerle a Uds. crédito más allá de duda razonable el testimonio ofrecido en Corte por los testigos Luis

Angel y Ramón Ramos Desardén, es la obligación en ley de Uds. absolver al acusado."

No tiene razón el apelante en este apuntamiento pues (a) la conducta del acusado después de la comisión del delito no sólo sirve para indicar una conciencia de culpabilidad de su parte, sino que también es relevante para demostrar la intención con que se cometieron los hechos y para hacer inferencias sobre la culpabilidad del acusado. Véanse a Warren *On Homicide*, Vol. 2, sec. 215, págs. 615–617; Wharton, *Criminal Evidence, op. cit.*, vol. 1, sec. 201, págs. 404–407; y (b) la instrucción con referencia específica al testimonio de determinados testigos de cargo en particular era innecesaria ya que se dieron instrucciones amplias y precisas sobre la credibilidad de los testigos, sobre duda razonable y los posibles veredictos que podía rendir el jurado.

XI–XII. Sostiene el apelante que el veredicto no está sostenido por la prueba y que el juez de instancia incidió al denegar la moción de absolución perentoria radicada por el apelante al amparo de la Regla Núm. 135 de las de Procedimiento Criminal.

Al comienzo de este dictamen hicimos una relación de los hechos que surgen de la prueba de cargo. El apelante negó en su testimonio los detalles sustanciales de dicha relación y el efectivo contrainterrogatorio de los testigos de cargo tendió a impugnar su credibilidad y sobre si en efecto ocurrieron muchos de los hechos esenciales relacionados. Nada aparece del récord al efecto de que el jurado actuara con pasión, prejuicio o parcialidad en su apreciación de la prueba o de que ésta fuese increíble o insuficiente de manera que no estamos justificados en intervenir con el juicio que de la misma hizo el jurado.

XIII. Por las razones previamente relacionadas, concluimos que el tribunal de instancia no incidió al denegar la

moción de nuevo juicio fundamentada en los argumentos y razonamientos previamente discutidos.

XIV. Por último, se arguye que del récord no surge con certeza que el veredicto fuese aceptado por el tribunal de instancia ni que la sentencia dictada corresponde al veredicto.

■ Del récord aparece que el tribunal de instancia, luego de cerciorarse que el veredicto había sido rendido por lo menos por nueve de los jurados, aceptó el mismo. Al hacer la comprobación del veredicto, el juez sentenciador se dirigió a cada jurado, uno de los cuales contestó "Quiero hacer una pequeña aclaración, Su Señoría. El veredicto que tengo entendido que fue aprobado, habemos dos personas que lo hemos calificado en 2do. grado y uno primer grado, tres mejor dicho. Otro contestó 'En 2do. grado'. Los demás contestaron 'Culpable'." Al terminar, el juez sentenciador preguntó a los miembros del jurado si el veredicto de asesinato en 1er. grado fue "de nueve a tres y los que votaron, esas tres personas votaron por Asesinato en 2do. grado" a lo que los señores del jurado contestaron que sí.

Arguye el apelante que el hecho de que el jurado José Avilés utilizara la expresión de que "el veredicto que tengo entendido que fue aprobado . . .", tiene el efecto de no satisfacer el "espíritu ni propósito de la regla del conocimiento preciso de los jurados a quienes se les interroga para la comprobación del veredicto sobre cuál ha sido en verdad el veredicto al cual ha llegado el jurado."

No tiene razón. El tribunal de instancia comprobó cumplidamente que el veredicto de asesinato en 1er. grado fue dictado por una mayoría nueve a tres de los jurados. *Pueblo v. Moreu Pérez*, 96 D.P.R. 60 (1968). Además, esta cuestión no fue planteada oportunamente por el apelante ante el tribunal de instancia.

*En vista de lo expuesto, debe confirmarse la sentencia dictada en este caso por el Tribunal Superior, Sala de Aguadilla, en 5 de enero de 1967.*

Los Jueces Asociados Señores Hernández Matos y Santana Becerra no intervinieron.