EL PUEBLO DE PUERTO RICO, apelado, *v.* MARÍA DE LOURDES MIRANDA SANTIAGO, apelante.

*Número:* CR-84-15 *Resuelto:* 1ro de junio de 1992

508

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

María de Lourdes Miranda Santiago fue encontrada culpable por Jurado de asesinato en primer grado, y por tribunal de derecho de poseer ilegalmente un arma de fuego. Art. 6 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. sec. 416. Inconforme, apela la sentencia de noventa y nueve (99) años de reclusión por el asesinato, concurrentes con seis (6) meses por la posesión ilegal del arma.[1]

Suscintamente la prueba de cargo[2] demostró que ella, en mutuo acuerdo con el menor Israel Merced Rosa (Isra),

_____

[1] En su alegato, hábilmente discute como errores: (a) la negativa del tribunal sentenciador a aplazar el juicio para contrarrestar el efecto nocivo de publicidad; (b) admitir prueba de referencia sobre manifestaciones incriminatorias del menor *Isra* e interrogar a un testigo de la defensa sobre el desenlace de una querella contra dicho menor por los mismos hechos; (c) negar una instrucción especial sobre impugnación de testigo pedida, y concederle una similar al Fiscal; (d) no disolver el Jurado; (e) declararla culpable con prueba que no establece su culpabilidad más allá de duda razonable, y (f) rechazar una solicitud de nuevo juicio.

[2] El testigo principal Víctor M. Mojica Rosado, en lo esencial, atestó que el 7 de mayo de 1983 (sábado), aproximadamente a las 2:15 a.m., estaba solo en el balcón de su apartamento en el Residencial Juan Jiménez García, en Caguas. Le dieron deseos de fumar. Como no tenía cigarrillos, salió a buscar quien le regalara uno porque sabía que a veces los "muchachos" estaban a esa hora por allí. En la placita cercana encontró reunidos a René Merced Rosa, c/p *Nasnai*, William Miranda Santiago, c/p *Willie Palomo*, y Raúl Rivera Rodríguez, c/p *Carachuela*. Le pidió a Willie un cigarrillo y se sentó a hablar con ellos. Minutos después llegó Israel Merced Rosa, c/p *Isra*, quien se unió al grupo. Más tarde se acercó a la placita un vehículo Maverick, color azul, conducido por un muchacho "trigueño", del cual se bajó la apelante Miranda Santiago.

El conductor permaneció dentro del vehículo mientras Miranda Santiago se acercó a ellos, agarró a *Isra* por un brazo y le dijo que tenía que hablarle; ambos se fueron detrás de un edificio. Luego Miranda Santiago se dirigió al automóvil, se montó y marchó con el conductor. *Isra* se fue en dirección hacia su casa, después regresó y le preguntó a su hermano *Nasnai* y al testigo si " 'quer[í]an asaltar al tipo que trajo María[, ] al pescao' ". Cuando ambos se negaron, *Isra* dijo que " 'iba a meter mano solo' ". Explicó que la expresión *traer al pescao* significaba que " 'lo trajo para ser asaltado, para que otro lo cañoneara' ". (Énfasis suprimido.) Exposición narrativa enmendada, pág. 4.

Varios minutos después, regresó el auto Maverick azul y Miranda Santiago permaneció hablando unos minutos con el conductor. Luego se bajó, subió el cristal de la puerta y la cerró. Ella caminó en dirección de su casa, pero por una ruta más lejana. En eso *Isra* dio la vuelta al vehículo y, mientras estaba detrás del baúl, sacó con su mano derecha un revólver de debajo de la camisa, haló el martillo y le gritó al conductor que era un asalto. El conductor aseguró la puerta, prendió el automóvil, le puso el cambio de arranque y, en el momento en que iniciaba su marcha, *Isra* le disparó. El testigo Mojica Rosado se encontraba a 40 pies de distancia de donde ocurrió el disparo. Al sonar el disparo, todos se marcharon. Cuando arribó al balcón de su casa sintió un leve "cantazo" y cuando llegó a su cuarto oyó uno fuerte. Levantó a su familia, fue al lugar donde estaba detenido el automóvil y vio a una persona acostada en el asiento con un tiro en la espalda.

llevó a Jaime Puig Benítez a un estacionamiento de un residencial público para que dicho menor le robara; en el transcurso del asalto, éste le disparó y dio muerte.

Examinemos sus señalamientos.

## I

El 6 de octubre de 1983, la apelante Miranda Santiago solicitó infructuosamente la suspensión del juicio señalado para el 10 de dicho mes. Adujo que una noticia de ese día publicada en *El Vocero* imposibilitaba seleccionar un Jurado imparcial en el área de Caguas, y que ello atentaba contra un juicio justo y el debido proceso de ley. Art. II, Secs. 7 y 11, Const. E.L.A., L.P.R.A., Tomo 1.

La noticia en cuestión contenía información sobre el procedimiento judicial seguido contra un menor (no identificado) en el Tribunal de Menores, encontrado "culpable" de asesinato en primer grado e infracción a la Ley de Armas. En lo pertinente, disponía:

> Se alegó que el menor, en compañía de su amiga María de Lourdes Santiago, de 20 años, alias "La Paloma", le dieron muerte de un balazo en la espalda a un oficial de la Guardia Nacional...

---

Francisco Vieta Delgado, policía, declaró que fue el agente asignado a la investigación. En el contrainterrogatorio admitió que se encontraron unos casquillos de bala en la calle cerca de donde se detuvo el vehículo luego de impactar un poste en la Calle Núm. 1, lo que no era compatible con la versión de que los disparos se hicieron cerca de la placita en la Calle Núm. 2 del residencial. Los casquillos no fueron ocupados, por lo que no se realizó un análisis de balística.

La Doctora Yocasta Brugal, médica-patóloga forense, testificó que realizó la autopsia del cadáver de Puig Benítez. La herida de bala causante de la muerte tuvo una trayectoria de abajo hacia arriba. Por ausencia de residuos de pólvora en la herida, consideró que el disparo se hizo a más de dos pies de distancia.

Por el Ministerio Fiscal declararon también Gilberto Puig Benítez, agente del C.I.C., hermano del interfecto, y Edgardo Esmuria, policía perito en fotos y huellas.

La *defensa* presentó entre sus testigos a *Nasnai, Carachuela* y a *Willie Palomo* quienes, en síntesis, negaron que hubiesen estado reunidos en la placita del residencial la noche del crimen. Declararon que no sabían nada de la forma en que ocurrieron los hechos.

Se alega que "La Paloma" llevó a Puig Benítez, para que el menor lo asaltara...

... Esta, alegadamente se vio con el boxeador con quien se puso de acuerdo para cuando volviera "con este tipo que está en el carro", lo asaltara. *El Vocero de Puerto Rico*, 6 de octubre de 1983, pág. 26.

Al final, la noticia informaba que el juicio "contra la compinche del menor", la acusada Miranda Santiago, se celebraría el día 10 de octubre. *El Vocero de Puerto Rico*, supra.

■ No erró el tribunal sentenciador. El derecho a juicio por jurado conlleva un juicio justo por un panel imparcial, basado sólo en evidencia admitida en el recinto judicial y no producto de fuentes externas. *Pueblo v. Maldonado Dipiní*, 96 D.P.R. 897 (1969). La mera publicación de informaciones noticiosas sobre procesos judiciales no atenta contra la garantía constitucional de juicio justo; recae sobre el acusado la obligación de demostrarlo. *Pueblo v. Chaar Cacho*, 109 D.P.R. 316, 326 (1980); *Pueblo v. Maldonado Dipiní*, supra, pág. 906. "[L]a publicación de noticias sobre el proceso judicial no constituye de por sí una violación al derecho del acusado a un juicio justo e imparcial." *Pueblo v. Pérez Santaliz*, 105 D.P.R. 10, 14 (1976).

■ Merece una vez más recordar que "[e]n Puerto Rico, donde el territorio es reducido y la población compacta, servida por medios de comunicación y difusión de eficacia máxima, sería imposible formar un Jurado totalmente ignorante y desconocedor .... La justicia no puede por tanto depender de la ignorancia, sino de la integridad de los jurados y de la firmeza de su compromiso de resolver guiados únicamente por la prueba que se presente en juicio". *Pueblo v. Tursi*, 105 D.P.R. 717, 720 (1977). Véase, además, *Pueblo v. Lebrón González*, 113 D.P.R. 81, 86 (1982).

En este caso no están presentes ningunas de las circunstancias extremas de publicidad adversa susceptibles

de generar una atmósfera de prejuicio comunitario, de la cual pueda presumirse que hubo una privación al derecho a ser juzgado por un Jurado imparcial; tampoco la apelante Miranda Santiago logró establecerlo. Primero, *todos* los miembros del Jurado durante el *voir dire* afirmaron al Juez, al Fiscal y al abogado defensor, que no tenían conocimiento personal de los hechos, por sí, por comunicación de alguna persona o por la lectura de una noticia en periódico de circulación general. E.N.P., págs. 2–3. No cabe alegación de perjuicio por una noticia que ninguno conoció. Y segundo, intrínsecamente notamos que la noticia era del tipo informativo, que relataba una síntesis de la prueba desfilada contra el menor, la cual también oportunamente *fue presentada* al Jurado en el juicio contra ella. No estamos, pues, ante un potencial perjuicio surgido cuando la prensa divulga hechos que no han pasado ni pasarán por el tamiz del juicio y que, por lo tanto, el acusado no ha tenido ni tendrá la oportunidad de confrontarlos en el proceso adversativo. *Pueblo v. Pérez Santaliz*, supra, págs. 14–15.

A fin de cuentas, la verdadera encuesta en juicios expuestos a mucha publicidad es determinar el estado mental que pudo haber imperado entre el Jurado. Lo realmente importante no es si el Jurado conoció o recuerda el caso en particular por los informes de prensa, sino que puede juzgar imparcialmente.

## II

Cuestiona la apelante Miranda Santiago la admisión en evidencia, a pesar de su oportuna objeción, de una declaración inculpatoria hecha por el menor *Isra*, por voz del testigo principal de cargo Mojica Rosado. Aduce que se trataba de prueba de referencia inadmisible, a la cual no le aplicaba la excepción de la Regla 62(E) de Evidencia, 32

L.P.R.A. Ap. IV,([3]) porque el concepto de coconspiración requiere que el declarante sea una persona susceptible de ser acusada y procesada por el mismo delito por el cual se acusa a la persona contra quien se usa la declaración. Basa su razonamiento en que el declarante Isra era menor de edad y que, bajo la Ley de Menores de Puerto Rico, 34 L.P.R.A. sec. 2201 *et seq.*, no podía acusársele por el mismo delito

Bajo esa tesis, según la Regla 62(E) de Evidencia, *supra*, "ningún menor puede ser un co-conspirador". Invoca los casos *Pueblo v. López Rivera*, 94 D.P.R. 579 (1967), y *Pueblo v. Montalvo Acevedo*, 83 D.P.R. 727 (1961). Allí resolvimos que cuando un menor estaba implicado, no aplicaba la Regla 156 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, que entonces requería la corroboración de la declaración del cómplice, pues dicho menor, por razón de su edad, era incapaz de cometer delitos y no podía ser procesado criminalmente en los tribunales ordinarios. Aunque de su faz el planteamiento es interesante, no tiene razón.

Al revisitar ambos casos —*Pueblo v. López Rivera*, supra, y *Pueblo v. Montalvo Acevedo*, supra— notamos que la razón que inspiraba la regla de mirar con sospecha la declaración de todo cómplice, estaba inspirada en la posibilidad de que éste actuara movido por alguna promesa de inmunidad o de mejor trato por las autoridades, a cambio de su declaración inculpatoria contra el acusado. Como se trataba de un menor —que no podía ser encausado criminalmente— era inaplicable la regla: *no podía presumirse que actuaba bajo promesa de inmunidad o con la esperanza*

---

([3]) Dispone:

"Es admisible como excepción a la regla de prueba de referencia una declaración ofrecida contra una parte si la declaración:

. . . . . . . .

"(E) es hecha por un co-conspirador de dicha parte durante el curso de la conspiración y en la consecución del objetivo de ésta." Regla 62(E) de Evidencia, 32 L.P.R.A. Ap. IV.

*de recibir un trato mejor que el acusado. Pueblo v. López Rivera,* supra, pág. 581.

▮▮▮ Esa razón de decidir *(ratio decidendi)* no gobierna el de autos. Todo proceso adjudicativo tiene el propósito de " 'hallar la verdad y hacer justicia a las partes. Las reglas procesales y en particular las de evidencia, persiguen viabilizar ese propósito; no obstaculizarlo' ". *Pueblo v. Ríos Nogueras,* 111 D.P.R. 647, 653 (1981); *J.R.T. v. Aut. de Comunicaciones,* 110 D.P.R. 879, 884 (1981). Al igual que su concordante federal, no podemos equiparar el concepto de conspiración sustantivo de la ley penal con el utilizado en las Reglas de Evidencia; no son iguales.

> Debemos notar la distinción entre el delito de "conspiración" y la excepción de un co-conspirador a la regla de prueba de referencia. Como delito, una conspiración comprende más que una mera empresa común. Incluye también otros elementos, tales como igual estado mental, intento criminal y, si requerido estatutariamente, un acto ostensible. Cuando se establecen estos elementos, el delito de conspiración ha sido probado.
>
> Por otro lado, la excepción del co-conspirador a la regla de prueba de referencia, es simplemente una regla de evidencia basada, hasta cierto punto, en conceptos de la ley de agente-principal. Puede aplicarse tanto en casos civiles como penales .... Su base, una apreciación de sentido común, de que una persona que ha autorizado a otra a hablar o actuar con un fin común será responsable por lo que más tarde, esté o no presente, diga o haga su agente. (Traducción nuestra.) *United States v. Trowery,* 542 F.2d 623, 626 (3er Cir. 1976). Véase *United States v. Gil,* 604 F.2d 546 (7mo Cir. 1979).

De acuerdo con este enfoque, para que pueda invocarse con éxito la excepción a la prueba de referencia que hace admisible las declaraciones hechas por un coconspirador, no·es necesario que se acuse por el delito de conspiración. *United States v. Gil,* supra, pág. 549; E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia,* San Juan, Pubs. J.T.S., 1985, Vol. I, Cap. VIII, pág. 310. Tampoco que el coconspirador pueda ser procesado por el mismo delito que

se imputa al acusado contra quien se usa la declaración; más aún, no es preciso que puedan ser cómplices bajo la ley penal. Véase *United States v. Kendall*, 665 F.2d 126, 130–132 (7mo Cir.), *cert.* denegado, 455 U.S. 1021 (1982); *United States v. Gil*, supra, págs. 548–550.

Repetimos, la ley penal sustantiva de conspiración no determina la conspiración necesaria para propósitos evidenciarios. "Aun cuando la regla se refiere a co-conspiradores, este Comité entiende que el significado de la regla es adelantar la doctrina universalmente aceptada de que un empresario común ('joint venturer') es considerado un co-conspirador para propósitos de esta regla, aunque no se haya formulado acusación de conspiración." (Traducción nuestra.) *Report of Senate Committee on the Judiciary*, citado en M.H. Graham, *Handbook of Federal Evidence*, 2da ed., Minnesota, Ed. West Publishing Co., 1986, Sec. 801.25.

■ Concluimos que para cumplir con el concepto de coconspirador requerido por la Regla 62(E) de Evidencia, *supra*, basta que se trate de una declaración hecha por una persona que actuaba en común acuerdo en la realización de un acto ilegal con la parte contra quien se ofrece. *United States v. Gil*, supra, págs. 549–550.

■ En estas circunstancias, para que sean admitidas estas declaraciones se requiere prueba adicional que establezca que existió una conspiración y que el declarante y el acusado formaban parte de ello. *United States v. Cawley*, 630 F.2d 1345, 1350 (9no Cir. 1980). También hay que demostrar que la declaración fue hecha mientras promovían la conspiración. *United States v. Ciampaglia*, 628 F.2d 632, 637 (1er Cir. 1980); Chiesa, *op. cit.*, págs. 310–312. Un menor de edad, que técnicamente no puede ser coautor o cómplice del delito imputado contra quien se ofrece la declaración, debe estimarse coconspirador para propósitos de la Regla 62(E) de Evidencia, *supra*. En el caso de autos, una vez el juez de instancia determinó que la declaración del

menor *Isra* cumplía con estos requisitos, quedó demostrada su admisibilidad.

Aclarado este extremo, examinemos los restantes argumentos bajo este mismo señalamiento. Se alega error al permitir que el testigo Mojica Rosado atestara "en forma de opinión" lo que había querido decir el menor *Isra* cuando afirmó que Miranda Santiago había traído "al pescao".

■ Aparte de que de la exposición narrativa enmendada no surge objeción oportuna —Regla 4 de Evidencia, 32 L.P.R.A. Ap. IV— la expresión era admisible no como opinión, sino como una explicación basada en el conocimiento y percepción del testigo sobre el término (argot) familiarmente usado en este ambiente de subcultura criminal. En materia de derecho probatorio, la tendencia moderna es favorecer la admisibilidad condicional del testimonio en forma de opinión. o inferencia de un testigo no pericial cuando éste se fundamenta en su conocimiento personal, está sujeto a ser contrainterrogado y el testimonio sirve de ayuda al juzgador a entender mejor la declaración o el hecho en controversia. Véase su equivalente en la Regla 701 de Evidencia federal, 28 U.S.C.; 3 *Weinstein's Evidence* Sec. 701[02], págs. 701-10 a 701-17 (1989); *United States v. Walker*, 495 F. Supp. 230, 232–233 (W.D. Penn. 1980).

■ Tampoco incidió el juez sentenciador al preguntar, luego del directo, al testigo de la defensa *Nasnai* sobre el resultado del procedimiento seguido contra su hermano *Isra* en el Tribunal de Menores. La pregunta no fue contestada por el testigo debido a la oportuna objeción de la defensa. *El Jurado no tuvo ante su consideración prueba alguna que pudiera haber causado perjuicio indebido.* La sola pregunta no privó del derecho a un juicio imparcial, pues "la mera posibilidad de que un acusado haya podido sufrir perjuicio a consecuencia de la conducta o del lenguaje usado por el juez, no es suficiente para anular un

veredicto condenatorio. El criterio para determinar si los comentarios impropios del juez han privado o no al acusado de su derecho a un juicio justo e imparcial, es el efecto que probablemente ha causado en el jurado el lenguaje usado por el juez". (Escolio omitido.) *Pueblo v. Matos*, 81 D.P.R. 508, 517 (1959).

■ Aunque el juez debe actuar con más cautela ante el Jurado, para esclarecer la verdad puede participar activamente. *Pueblo v. Pabón*, 102 D.P.R. 436, 440 (1974). Esa intervención no debe ser injustificada, con el propósito de contradecir o desacreditar al acusado o sembrar dudas sobre la teoría y veracidad de los testigos de la defensa. *Pueblo v. Matos*, supra, págs. 515–517; *Pueblo v. Nieves Alvelo*, 89 D.P.R. 47, 49 (1963); *Pueblo v. Aletriz*, 85 D.P.R. 646, 652–653 (1962). Este incidente aislado consistente de una sola pregunta —que no fue contestada— es insuficiente para crear una probabilidad razonable de perjuicio sustancial.

## III

El testigo de cargo Mojica Rosado, durante el contrainterrogatorio, declaró "que nunca había sido sospechoso en el caso. Que nunca le habían informado que era sospechoso de haber sido el autor de la muerte del Sr. Jaime Puig Benítez". Exposición narrativa enmendada, pág. 7. Cuando la defensa lo confrontó con su declaración jurada prestada ante el Fiscal investigador, "[n]o pudo explicar [por qué] en la declaración jurada aparecía recibiendo las advertencias como sospechoso del asesinato del Sr. Jaime Puig Benítez". (Énfasis suprimido y escolio omitido.) Íd., pág. 8.

Subsiguientemente, el testigo de la defensa Merced Rosa (Nasnai), le contestó al Fiscal que todo lo que había afirmado en el juicio no lo había dicho en su declaración jurada previa al Fiscal, porque no se lo habían preguntado.

El Fiscal entonces lo confrontó con la declaración jurada escrita de la cual surgía que se le había preguntado, si había algo más que quisiera declarar "aunque no se le hubiese preguntado", y el testigo había contestado que eso era todo.

Ante estos dos (2) incidentes, la apelante Miranda Santiago argumenta que erró el tribunal al no impartir al Jurado una instrucción específica de *impugnación por contradicción* solicitada con relación al testigo de cargo Mojica Rosado al amparo de la Regla 47(A) de Evidencia, 32 L.P.R.A. Ap. IV, y sin embargo, a petición del Fiscal concedió una sobre impugnación de testimonio por *omisión* con referencia al testigo de defensa *Nasnai.*

La norma general sobre instrucciones al Jurado exige que se cubran "los elementos esenciales de las defensas levantadas por el acusado, así como los puntos de derecho que bajo cualquier teoría razonable pueden estar presentes en las deliberaciones, aunque la prueba de la defensa sea débil, inconsistente o de dudosa credibilidad. ... Ello es así porque corresponde al jurado y no al tribunal rendir un veredicto conforme a la ley y los hechos del caso, según aquél aquilate la prueba y determine los hechos". *Pueblo v. González Colón*, 110 D.P.R. 812, 815 (1981).

Del testimonio del testigo de cargo Mojica Rosado surgió una incompatibilidad cuando éste negó que hubiese sido sospechoso en el caso y luego, confrontado con la declaración jurada, aceptó que se le hicieron las advertencias "como sospechoso de un delito". Notamos, sin embargo, que no hubo ninguna contradicción entre lo afirmado por dicho testigo en su declaración jurada: realmente no estamos frente una manifestación anterior contradictoria.

La instrucción solicitada por la apelante Miranda Santiago aparece en el Manual de Instrucciones al Jurado para el Tribunal Superior de Puerto Rico, San Juan, Ed. C. Abo. P.R., 1976, pág. 20. No erró el tribunal de instancia al

negarse a impartirla. La misma sólo es aplicable cuando el testigo ha hecho anteriores manifestaciones que no concuerdan con su testimonio en el juicio. *Pueblo v. González Colón*, supra, pág. 821; *Pueblo v. Hernández Santiago*, 97 D.P.R. 522, 530 (1969). De la declaración jurada escrita que se produjo para impugnarlo no surge que hubiese afirmado que realmente tuviera conocimiento de que era sospechoso en el caso. La única incompatibilidad surgida es haber negado que se le hubiese informado que era sospechoso, cuando de dicha declaración jurada se desprendía que el fiscal le hizo las advertencias de rigor (*Miranda warnings*) "como sospechoso sujeto a interrogatorio" y le indicó que figuraba como sospechoso en la investigación pero no de una manifestación anterior contradictoria. Se trata de una incompatibilidad entre lo afirmado por el testigo y lo que surgía de la declaración jurada. La instrucción que correspondía era la que versa sobre inconsistencia en lo declarado por testigo —Manual de Instrucciones al Jurado para el Tribunal Superior de Puerto Rico, *supra*, pág. 19— y no la de impugnación por manifestaciones contradictorias del testigo.

El error no fue denegar la instrucción solicitada, sino, *sua sponte* no haber dicho foro ofrecido la instrucción que correspondiera sobre inconsistencia.

 "[L]os tribunales de instancia tienen la ineludible responsabilidad de velar [por que] sus instrucciones sean correctas, claras, precisas, y lógicas." *Pueblo v. Ortiz Martínez*, 116 D.P.R. 139, 150 (1985). En el presente caso reafirmamos la norma de que "para que una negativa a trasmitir instrucciones solicitadas dé lugar a revocación[, ] la instrucción debe ser correcta, el punto no debe haber sido cubierto en otras instrucciones y lo omitido debe referirse a un punto vital de manera que esa negativa prive al acusado seriamente de una defensa efectiva". *Pueblo v. Saenz Forteza*, 100 D.P.R. 956, 963 (1972). Procede que re-

voquemos una convicción, si el error en las instrucciones impartidas o en las omitidas por el tribunal son de tal naturaleza que de no haberse cometido probablemente el resultado del juicio hubiera sido distinto o que el error cometido "violara derechos fundamentales o sustanciales del acusado". *Pueblo v. Torres Rodríguez*, 119 D.P.R. 730, 740 (1987).

Sin embargo, el error cometido —no impartir una instrucción relativa a las inconsistencias en lo declarado por un testigo de cargo— no tiene alcance revocatorio.

En cuanto al testigo de la defensa Merced Rosa (Nasnai), erró el tribunal de instancia al impartir la instrucción especial solicitada por el Fiscal sobre impugnación del testimonio por haber declarado en el juicio sobre hechos que había omitido en la declaración jurada que había prestado ante él. Efectivamente, en el juicio incluyó hechos adicionales producto de la información obtenida por preguntas específicas de la defensa y del Fiscal. Como de la prueba presentada no surgía que el testigo hubiese omitido un hecho esencial al prestar la declaración jurada anterior en comparación con su testimonio del juicio, no procedía esa instrucción especial.

■ Una impugnación a la veracidad de un testigo por omisión debe versar sobre un hecho esencial. *Pueblo v. Cortés del Castillo*, 86 D.P.R. 220, 224 (1962). Cuando es natural que el testigo haya declarado sobre un hecho la primera vez, y no lo hizo, ello equivale a una manifestación de inexistencia de ese hecho. 3A *Wigmore on Evidence* Sec. 1042 (1970). Al compararse la declaración jurada del testigo (*Exhibit* 6 del Pueblo) y su testimonio según la exposición narrativa enmendada, encontramos que no existe ninguna omisión sobre un hecho esencial.

■ Los autos originales no reflejan específicamente las instrucciones generales o especiales impartidas al Jurado. Tampoco que se hubiese objetado la instrucción

especial solicitada por el Fiscal. En ausencia de lesión directa a algún derecho fundamental se estima renunciado. *Pueblo v. Negrón Vélez*, 96 D.P.R. 419, 433 (1968); *Pueblo v. Pacheco*, 83 D.P.R. 526, 532 (1961); *Pueblo v. Negrón*, 79 D.P.R. 296, 302 (1956). En este caso el Jurado tuvo la oportunidad en el juicio de aquilatar la credibilidad de ambos testigos. El Jurado observó y oyó sus explicaciones cuando fueron confrontados con sus primeras declaraciones juradas. Aunque el tribunal incidió al impartir la instrucción especial solicitada por el Fiscal, el Jurado pudo por su cuenta determinar si en realidad existió contradicción por omisión al escuchar la declaración jurada del testigo de la defensa y su testimonio. A ellos correspondía aquilatar el valor y el grado de credibilidad. No intervendremos con su discreción en ausencia de parcialidad, prejuicio o error manifiesto. *Pueblo v. De Jesús Rivera*, 113 D.P.R. 817, 826 (1983); *Pueblo v. Rodríguez Hernández*, 91 D.P.R. 183, 203 (1964).

## IV

Reclama la apelante Miranda Santiago que debió disolverse el Jurado. Se basa en que luego de haber estado deliberando alrededor de una hora y media, los miembros del Jurado regresaron a Sala e informaron que habían llegado a un veredicto en el cargo por violación a la Ley de Armas pero no en el de asesinato. Su presidente, Ángel Vergara, indicó que la jurado Blanca Lydia Fonseca había manifestado que todos estaban prejuiciados; otro jurado indicó que no estaba de acuerdo y que quería hablar con el juez. Transcripción parcial de incidente, pág. 2. Al preguntársele a la señora Fonseca que explicara por qué entendía que los demás jurados estaban prejuiciados, ella contestó que desde antes de que empezara el juicio ya se estaban haciendo comentarios de lo que iba a pasar y de la decisión que se iba a tomar; según su pensamiento y sentir, la de-

cisión estaba tomada de antemano. Íd., pág. 5. Otro jurado, Sixto Alvelo, manifestó estar en parte de acuerdo, porque en los días que habían estado reunidos se habían hecho comentarios respecto al caso. Íd., pág. 6. Luis F. Vega declaró que el incidente se suscitó durante la deliberación y que la imputación no era cierta. A juicio suyo, los miembros del Jurado estuvieron juzgando la causa de acuerdo con la prueba desfilada y llegaron a una conclusión. Recordó, además, que el señalamiento se hizo *luego de llegar a un veredicto*. Íd., pág. 8. A preguntas del juez, la señora Fonseca indicó que sólo *uno* había hecho manifestaciones que demostraron prejuicio y señaló a Vega. El juez inquirió si algún otro estaba de acuerdo con la imputación de prejuicio, pero ninguno levantó la mano; por el contrario, permanecieron en silencio. Íd., págs. 9–10. El juez preguntó a todos si podían deliberar con mente abierta, "empezar la prueba y llegar a una conclusión como lo estaban haciendo anteriorment[e]". Íd., pág. 11. Todos manifestaron en la afirmativa. Vega, contra quien se había hecho la imputación, manifestó que no podía volver al salón de deliberaciones porque la señora Fonseca se negaba a retractarse. El juez lo ilustró de que lo importante realmente era que actuara de acuerdo con su conciencia, en forma justa e imparcial, sin sentirse presionado de una u otra forma. Lo instruyó que basara su decisión en la prueba y en las explicaciones sobre el derecho aplicable. Finalmente, repitió la instrucción sobre presunción de inocencia e instruyó al Jurado a analizar la prueba y emitir su voto de acuerdo con sus respectivas conciencias. Íd., págs. 11–13.

Así las cosas, el Jurado se retiró a continuar la deliberación. La defensa solicitó su disolución. El juez se negó pues estimó aclarada satisfactoriamente la situación. Transcripción parcial de evidencia, pág. 17. Después el Jurado regresó a Sala y su presidente indicó que habían encontrado a la acusada *culpable* de asesinato en primer

grado (9 a 3), y *no culpable* (11 a 1) en la infracción al Art. 8 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. sec. 418.

Frente a este cuadro, la tesis de la apelante Miranda Santiago es que el juez debió seguir investigando uno a uno a los demás miembros del Jurado para comprobar la magnitud y certeza de la imputación. No nos persuade.

▮ La garantía constitucional a ser juzgado por un Jurado forma parte del debido proceso. Significa que los miembros del Jurado deben ser indiferentes, esto es, juzgar sin ánimo prevenido. Implica que puedan dejar a un lado cualquier impresión u opinión preconcebida y rendir un veredicto a base de la evidencia admitida en el juicio. Se presume que el Jurado ha actuado de ese modo. *Pueblo v. Prados García*, 99 D.P.R. 384, 394 (1970).

Según relacionado el incidente, no hay base suficiente para derrotar esta presunción. La imputación de parcialidad se hizo sólo contra uno de los miembros del Jurado, y éste al sentirse indignado trajo el asunto para aclararlo. Sólo uno estuvo de acuerdo. Luego de la intervención del juez, todos asintieron de que podrían continuar deliberando con mente abierta. El jurado contra quien se hizo la imputación declaró que su conclusión sería conforme a la prueba desfilada y dio a entender que el incidente se debió a que el otro jurado estaba en contra de su posición.

En esas circunstancias, la determinación del juez de instancia de aceptar como cierta la capacidad de imparcialidad del Jurado, merece nuestra deferencia; éste estaba en mejor condición para aquilatarla. *Pueblo v. Figueroa Rosa*, 112 D.P.R. 154 (1982). La naturaleza y extensión de su investigación fue dentro del margen de su discreción. *Pueblo v. Prados García*, supra, pág. 395. "En Puerto Rico hemos resuelto que el juez de instancia está en mejor posición que este Tribunal para resolver si se justifica o no disolver el jurado. Si existe base razonable para la actua-

ción del juez no intervendremos con su determinación." *Pueblo v. Vélez Díaz*, 105 D.P.R. 386, 389 (1976).

## V

Por último, la apelante Miranda Santiago sostiene que no se derrotó la presunción de inocencia; cuestiona, además, la negativa a un nuevo juicio. La prueba presentada estableció más allá de duda razonable su culpabilidad por asesinato en primer grado en la modalidad de asesinato estatutario. Responde por la muerte ocasionada por el menor *Isra* al perpetrar el delito de robo actuando de común acuerdo. Art. 83 del Código Penal, 33 L.P.R.A. sec. 4002; *Pueblo v. Jiménez Hernández*, 116 D.P.R. 632 (1985); *Pueblo v. Calderón Laureano*, 113 D.P.R. 574, 580 (1982). Quedó probada la existencia de ese común acuerdo para asaltar a Puig Benítez, víctima que ella llevó al lugar. Cuando Puig Benítez se percató de la intención de Isra, trató de escapar. A tal efecto, puso su vehículo en marcha pero Isra, le hizo un disparo mortal.

No nos convence la apelante Miranda Santiago de que se hubiesen violado algunos de sus derechos fundamentales. Actuó correctamente el tribunal de instancia al denegar la moción de nuevo juicio. *Pueblo v. Prados García*, supra, pág. 394; *Pueblo v. Martínez Valentín*, 102 D.P.R. 492, 498 (1974).

*Se dictará sentencia confirmatoria.*

La Juez Asociada Señora Naveira de Rodón concurre con el resultado sin opinión escrita.