# 2002 DTA 103

## TRIBUNAL DE CIRCUITO DE APELACIONES
## CIRCUITO REGIONAL III DE ARECIBO/UTUADO

EL PUEBLO DE PUERTO RICO
Apelado

v.

JOSE J. IRIZARRY RIVERA
Apelante

Núm. KLAN-2001-00468

San Juan, Puerto Rico, a 31 de mayo de 2002

Panel integrado por su Presidente, el Juez Soler Aquino
y los Jueces Colón Birriel y Escribano Medina

Colón Birriel, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

### I

José Juan Irizarry Rivera t/c/p José J. Irizarry Colón (en lo sucesivo el "*apelante*") solicita la revocación de una **Sentencia** en grado de reincidencia por Asesinato en Primer Grado dictada el 23 de abril de 2001, por el Tribunal de Primera Instancia, Sala Superior de Utuado (en lo sucesivo el "*TPI*"), en el caso de *El Pueblo de P. R. v. José Juan Irizarry y/o José J. Irizarry Colón,* Criminal LVI2000G0017. El jurado que entendió en el juicio emitió veredicto de culpabilidad por mayoría de nueve o más, luego de lo cual, el TPI lo encontró culpable del delito imputado, sentenciándolo a 99 años de prisión, más 49 años y seis meses por la reincidencia. Tras otros incidentes, el apelante sometió su alegato. Por su parte, el Pueblo de Puerto Rico, representado por el Procurador General, hizo lo propio. Con el beneficio de las comparecencias, de los autos originales y de la transcripción de la prueba oral, resolvemos.

### II

Por hechos ocurridos el 10 de marzo de 1988 en el municipio de Utuado, el 13 de septiembre de 2000, el Ministerio Público presentó denuncia contra el apelante por infracción al Art. 82 del Código Penal, asesinato en primer grado. Se le imputó haber dado muerte a Jeanette González Serrano, de forma ilegal, voluntaria, maliciosa, criminalmente, con alevosía, malicia premeditada y deliberación; utilizando para ello un arma de fuego para la cual no tenía licencia de posesión ni de portación. El 16 de octubre de 2000, fue celebrada la Vista Preliminar, determinándose causa probable para acusar por el delito imputado. Posteriormente, el Ministerio Público presentó la siguiente acusación:

"*El referido acusado, José Juan Irizarry Rivera y/o José J. Irizarry Colón, allá en o para el día 10 de marzo de 1988 y en Jayuya, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia, Sala Superior de Utuado, Puerto Rico, ilegal, voluntaria, maliciosa y criminalmente, con alevosía y malicia premeditada y deliberación y con el propósito decidido y firme de matar, dio muerte al ser humano Jeanette González Serrano, consistente dicho acto en que utilizando un Revólver marca Smith & Wesson, color negro, calibre 38 Special con cachas en madera, de 4 pulgadas de cañón, con la serie C-68-5716, para el cual no tenía licencia de portación ni de posesión, le hizo dos disparos en la región infraclavicular izquierda ocasionándole la muerte en el acto.*"

El Fiscal alega Reincidencia por cuanto el acusado de epígrafe fue sentenciado el día 25 de octubre de 1988 por el Art. 8 de la Ley de Armas con el número de caso 19870036 por el Honorable Tribunal Superior de Utuado; sentencia ésta final y firme.

Tras otros incidentes, el 8 y 9 de marzo de 2001, se celebró el juicio por jurado, previo a lo cual, el apelante aceptó la reincidencia que le fue alegada; luego la secretaria de sala leyó la acusación a las damas y caballeros del jurado (sin la reincidencia alegada), reiterándose el apelante en su alegación de no culpable. Juramentada la prueba, el Ministerio Público, representado por el Fiscal Lcdo. José M. Delgado Rodríguez, ofreció su teoría, luego de lo cual el Lcdo. Herminio Maldonado González de la Sociedad Para Asistencia Legal, en representación del apelante, siendo advertido de que era opcional el dar su teoría, procedió a así hacerlo. Así las cosas, el Ministerio Público procedió en apoyo a su teoría, a presentar su prueba de cargo consistente en el testimonio de varios testigos. Durante el proceso, el TPI admitió prueba documental, tanto del Ministerio Público como del apelante. A continuación, en lo pertinente, los testimonios prestados, según la transcripción de la prueba:

**Primer Testigo: Miguel Angel Díaz Torres, (agente de la policía que tomó las fotografías de la escena de los hechos), págs. 18-30 de la transcripción.**

Declaró que para el día de los hechos, 10 de marzo de 1988, trabajaba en la Unidad de Servicios Técnicos

del CIC Area de Ponce. Ese día recibió una notificación de que habían encontrado el cadáver de una dama, en la carretera 114, más o menos a la altura del Km. 14.2 del Barrio Salientito del Municipio de Jayuya. Se personó al lugar de los hechos en unión a su compañero, el agente Fernando Vals, donde encontraron el cadáver de una dama gruesa, de tez blanca, el cual correspondía al de Jeanette González. Parte del cuerpo se encontraba de la cintura hacia arriba boca abajo y de la cintura hacia abajo de medio lado. Vestía un pantalón mahón azul claro, abrigo color negro, debajo del cual vestía una blusa o *t-shirt* color blanca con palabras grandes que le cubrían todo el pecho "*Made in Puerto Rico*". El cadáver presentaba unas heridas de bala en el lado izquierdo casi entre la clavícula y el cuello. Cerca del cadáver se encontró un revólver negro, y unas sandalias.

Cuando llegaron a la escena, allí se encontraba el Sargento Santos con su personal, quienes ya habían acordonado el sitio. Tomó 24 fotografías, incluyendo la escena, al cadáver, al área de la finca, a la carretera, a una camioneta y al arma de fuego. Autenticó varias fotografías de las que había tomado en el lugar de los hechos, así como el arma encontrada. Indicó que la identificación 3 del Pueblo que se le mostró, que luego fue marcada como exhibit 3 del Pueblo, correspondía al revolver encontrado en la escena. Testificó que el revolver estaba bien cerca del cadáver.

**Segundo Testigo: Ramón Marrero Rodríguez (Vigilante de Recursos Naturales), págs. 30-64 de la transcripción.**

*Trabaja para el Departamento de Recursos Naturales como vigilante en el área de Toro Negro ubicado en los municipios de Orocovis, Jayuya, Juana Díaz y Ponce. El día de los hechos, alrededor de las siete y media de la mañana, se encontraba con su compañero Padua, subiendo en el sector La Loma del Viento en el Barrio Salientito de Jayuya en dirección a Toro Negro, cuando vio a una persona a mano derecha de la carretera 144 que conduce a Jayuya, levantando la mano derecha como pidiendo ayuda. Detuvieron el vehículo, se bajaron y al chequear a la persona que pedía ayuda, vieron que tenía una perforación en el lado izquierdo del pecho, como si hubiera sido un tiro de contacto, pues tenía pólvora pegada.*

*Le preguntaron qué había sucedido, y éste indicó "allá, allá", dejo a su compañero Padua con el herido y se metió a la maleza y encontró a Jeannette, la occisa. El cadáver estaba a algunos 75 pies en línea recta de donde la persona fue encontrada. Testificó que al otro lado de la carretera, fuera de ésta, había estacionada una guagua Ford Torino, que se encontraba cerrada. El cadáver se encontraba en cuclillas hacía la maleza, con un mahón azul subido a la rodilla, boca abajo con las manos entrelazadas. La dama vestía unas pantaletas rojas, las que tenía puesta, de la cintura para arriba vestía una blusa. Se percató que como de dos a tres pies del cadáver había una camita como hecha de cartones.*

*El área donde localizaron el cadáver era un camino vecinal dentro de una finca. Donde terminaban los cartones había un portón de "cyclone fence". Los cartones eran recientes y estaban colocados sobre la maleza. Supo que la dama había fallecido porque le tomó los signos vitales, le tocó la carótida, no encontró signo de violencia. Tenía dos heridas en el lado izquierdo debajo del área de la clavícula, una cerca de la otra.*

*Llamó a Padua y le preguntaron al herido si había un arma o algo. Chequean y al buscar entre la maleza (gramalota), encontraron un arma a más o menos siete a ocho pies del cadáver. La cabeza de la occisa quedaba en dirección opuesta de donde se encontraba el arma. Acto seguido, procedieron a proteger la escena marcándola con unos palitos. En el área de los hechos no había residencias, teléfono ni alumbrado.*

*Recogieron al herido y lo llevaron en la "Suzuki" de Padua para el hospital. Camino al hospital (Barrio Coabey) se encontró al agente Montijo, quien les dio escolta. Al llegar al hospital, le informan al agente Montijo lo que pasó y éste le notifica al Sargento Santos. Posteriormente, el Sargento Santos, Montijo y otros regresaron a la escena.*

*Declaró que tomo adiestramiento de armas en la policía, en la academia y en el ejercito. Describió el arma que encontraron en la escena como idéntica a la que aparece en el exhibit tres del Ministerio Publico. Declaró que para que salgan dos balas de un revolver hay que apretar el gatillo dos veces, y tres veces para que salgan tres. Al regresar a la escena, la encontró idéntica a cuando la dejó para llevar al herido al hospital.*

*En el contra interrogatorio del Lcdo. Maldonado González al Sr. Marrero Rodríguez, encaminado a impugnar su testimonio, indicó que nunca vio manejar al apelante; pero sí había visto a la occisa manejando la guagua Ford encontrada en el lugar de los hechos, presume que la guagua era de ella, quién la llevo al lugar de los hechos.*

**Tercer Testigo: José A. Santos (Sargento de la policía, retirado), págs. 64-75 de la transcripción.**

*Declaró que actualmente está retirado. El día de los hechos era Sargento de la policía asignado al Distrito de Jayuya; ese día a eso de siete o siete y media de la mañana recibió una llamada del guardia Montijo, informándole que se dirigía con una persona herida al hospital. Se dirigió al hospital donde llegó Montijo acompañando a dos guardias de Recursos Naturales de apellidos Padua y Marrero, quienes llegaron con una persona herida, a quien identificó como Irizarry (el apelante). En ese momento, entrevistó al apelante, quien le manifestó que "Jeanette lo había herido y que la fueran a buscar porque ella estaba muerta". Estuvieron unos minutos en el hospital observando los procedimientos, luego de lo cual se dirigió en unión a los guardias de recursos naturales y el agente Montijo al lugar donde el apelante le había indicado, es decir, a la carretera 144 del Barrio Salientito.*

*Al llegar al lugar de los hechos, el que describe como un cafetal, un bosque y maleza, sin residencias cerca, los guardias de recursos naturales le enseñaron la guagua. Era una guagüita Ford de dos asientos, de cuatro puertas y doble asiento, la que se encontraba bien estacionada dentro de la carretera. El cadáver de la joven, a quien conocía de vista, se encontraba sobre unos cartones más o menos como en cuclillas, boca abajo, con el pantalón a mitad de quitar, con el pantie puesto. Cerca de ella había un revólver negro con cabo de madera, el que identificó en el exhibit tres del Ministerio Público. El revolver tenía un sólo casquillo, el que se queda en la masa cuando se dispara el revolver. Hizo una demostración a los miembros del jurado en cuanto a lo que era la masa del revolver. El revolver era de seis tiros. Conocía al apelante de vista; residía en el Barrio Río Grande cerca del pueblo; no sabía la relación entre éste y la occisa.*

*En el contra interrogatorio declaró que observó la guagua, la que se encontraba con las puertas cerradas; no sabe si con llaves. La guagua era de la occisa, a quien conocía de vista, era bastante llenita, pesando cerca de 280 libras. Vio solamente una de las heridas que tenía la occisa cerca del corazón al lado izquierdo tirando al hombro. Indicó que la occisa manejaba vehículos de motor y anteriormente la había visto manejando la guagua que se encontró en el lugar de los hechos.*

*A preguntas del abogado defensor, leyó una parte de su declaración, donde el apelante le comunicó en la sala de emergencia del hospital que fuera a buscar a Jeannette (la occisa) que estaba... Le preguntó quién lo había herido y le dijo que Jeannette.*

**Cuarto Testigo: Rolando Padua Santiago (Vigilante de Recursos Naturales), págs. 75-87 de la transcripción.**

*El día de los hechos, en horas de la mañana, se dirigía uniformado con su compañero Marrero Rodríguez en su vehículo privado (un Suzuki negro del 1985) a tomar servicio como vigilante de Recursos Naturales en su área de trabajo, cuando se topó con la persona herida (el apelante). Declaró, en lo pertinente, similar a lo que declaró su compañero. Indicó que el arma se encontraba de dos a dos pies y medio, al lado de los pies del cadáver de Jeannette. Observó que el Sargento Santos cogió el arma en la mano; no sabe qué hizo con ella.*

*Observó en la escena unos cartones bien puestos al lado de la occisa; observó la guagua Ford Torino al otro lado de la carretera.*

*De conformidad con la declaración jurada que había prestado anteriormente, en el contra interrogatorio señaló que el apelante le había dicho "ella me disparó, ella me disparó", imaginando él que se refería con esas expresiones a la occisa.*

**Quinto Testigo: Paula Morales (trabajaba para el Departamento de Servicios Sociales, hoy Departamento de la Familia), págs. 87-90 de la transcripción.**

*Declaró que trabajó cuidando los dos niños del apelante; trabajo que antes realizaba la occisa. La occisa quería mucho a los niños. Ella y la occisa trabajaban con Servicios Sociales; una tal Doña Carmen de esa agencia, la trasladó a trabajar a la casa del apelante donde la occisa cuidaba a sus niños y a la occisa se le traslado a trabajar donde ella trabajaba. Fue a trabajar a la casa del apelante porque su anterior trabajo era muy lejos y no tenía transportación. Ella sabe la razón por la cual fue a trabajar a la casa del apelante; no sabe la razón por la cual la occisa se quería trasladar de la casa del apelante. Indicó, que antes de comenzar a trabajar en la casa del apelante, quien era casado, pero no vivía con su esposa, la occisa le había indicado: "doña Paula, por favor, le pido no le acepte dinero a Juan".*

**Sexto Testigo: Andrés Pérez Rivera (hermano del apelante), págs. 90-93 de la transcripción.**

*Declaró que es comerciante en el municipio de Jayuya, a eso de seis y media a siete de la mañana del 10 de marzo de 1998, día de los hechos, el apelante, su hermano por parte de madre, fue a su negocio, donde se tomó un café y le habló sobre unas escrituras, que le iba a entregar al Lcdo. Puig. No sabe el propósito por el cual le mencionó lo de las escrituras. No hablaron de ninguna otra cosa.*

**Séptimo Testigo: José A. Mercado Negrón (Químico del Instituto de Ciencias Forenses), págs. 93-108 de la transcripción.**

*Antes del comienzo de su testimonio, por estipulación se marcó como exhibit IV del Ministerio Fiscal el Certificado de Análisis Sección Armas de Fuego preparado el 2 de junio de 1988, por Oscar De León Gómez, Especialista en Armas de Fuego; y como exhibit V del Ministerio Fiscal el Certificado de Análisis Químico Forense preparado el 13 de junio de 1988, por él. Declaró que recibió la evidencia en este caso de manos del agente Fernando Vals. Su área de conocimiento (expertise) en el área forense es en residuo de disparo, distancia de disparo, drogas, explosivo, tierra y todo lo que conlleve análisis químico. En este caso efectuó una prueba de distancia de disparo a unas camisas y una guayabera del apelante. Testificó que en el cuerpo de la occisa se recuperaron dos proyectiles, pero sólo le fue entregado un sólo casquillo. Además, realizó una prueba de guanteleta de parafina de palma y dorso de la mano tanto del apelante, como de la occisa, prueba que en ambos casos dio positiva. No obstante, indicó que esta prueba está obsoleta en estos momentos y no se usa para nada. Sostuvo, además, que es posible que alguien que no haya disparado un arma de fuego de positivo, porque el reactivo que se utiliza es difinelamina, la cual no determina si los residuos nitrados provienen de un disparo, abono, cosméticos, orina, gasolina, perfume, nicotina, etc. En fin, son muchas cosas que pueden dar positivo.*

*Los dos proyectiles que fueron encontrados en el cuerpo de la occisa y el casquillo encontrado en la escena fueron disparado con el revolver que previamente había identificado. Para disparar ese revolver, "hay que hacerle bastante presión". Bastante presión para levantar el gatillo.*

**Octavo Testigo: Edgardo Montijo Rodríguez (agente de la Policía), a las págs. 110-117 de la transcripción.**

*Declaró ser patrullero en la Policía de Puerto Rico; que el día de los hechos trabajaba como tal en un vehículo oficial rotulado. Ese día, a eso de siete a siete y media de la mañana, el conductor de un suzuki (Padua), acompañado de otra persona, lo mandó a detener para informarle que llevaban a una persona herida de bala. Escoltó a los vigilantes de Recursos Naturales hasta el hospital de Jayuya, donde llevaron al apelante. Allí se encontró con el Sargento José A. Santos. El Sargento Santos le informó que había una persona muerta en el área de Asomante. Posteriormente, fue hasta el lugar de los hechos donde observó una guagua Ford Torino. Observó a una mujer boca abajo, acostada como arrodillada. La mujer se encontraba sobre un cartón, más o menos de su tamaño. Tenía un mahón color azul, un sweater tejido, y una blusa que estaba manchada de sangre. Inmediatamente observó a eso de 7 pies más o menos de distancia de los pies de la occisa, un revólver color negro, el cual levantó el sargento José A. Santos Rodríguez, quien procedió a inspeccionar su masa y acto seguido, la cerró y colocó el revólver cerca de la cabeza de la occisa, protegió la escena y esperó que llegara el fiscal. Declaró sobre el arma de fuego encontrada en la escena, su masa, cómo dispararla para hacer un disparo, dos, tres, lo que es un casquillo, y dónde permanece después de disparado el revolver. Había visto a la occisa y al apelante.*

### Noveno Testigo: Fernando Luis Vals Rivera (agente de la Policía), págs. 118-130 de la transcripción.

*Para la fecha de los hechos trabajaba en la sección de homicidios, delitos contra la persona del CIC de Ponce. Una vez se le notifica de los hechos, fue a la escena vio a una persona del sexo femenino muerta. Estaba en posición de cubito ventral, o sea boca abajo. Inspeccionó a la occisa, su vestimenta, etc. Observó un arma de fuego aproximadamente a dos pies de distancia de la cabeza de la occisa, así como una guagua Ford Torino a orilla de la carretera 144. Le hizo una inspección a la guagua, no encontró nada sobresaliente, sólo una cartera tipo wallet conteniendo una libreta de bancos y otros efectos. Ocupo la evidencia en la escena y la identificó marcándola con su firma, cosa que hizo hasta entregarla como evidencia a la Fiscalía de Utuado. Indicó que en la escena se hizo una búsqueda espiral para tratar de localizar alguna otra evidencia, y aparte de lo señalado no se encontró ninguna otra. Indicó que de la investigación que realizó se desprendió que entre la víctima y el ahora apelante existía una relación sentimental.*

*Como parte del procedimiento, al otro día, a eso de las dos a dos y media de la tarde, visitó al apelante en el hospital, le leyó las advertencias de rigor de un documento que siempre lleva consigo, le preguntó si las entendió y dijo que sí. Procedió a preguntarle si estaba dispuesto a hacerse una prueba de parafina; si tenía residuos de nitratos en la palma de la mano y accedió a ello. A la occisa también le fue realizada esa prueba. No sabía si el arma encontrada en la escena había sido movida de ésta antes de él llegar.*

### Décimo Testigo: Madeline González Serrano (hermana de la occisa), págs. 131-140 de la transcripción.

*Declaró que es hermana de la occisa, quien tenía un hijo de cuatro años. Su hermana cuidaba los dos niños del apelante por asignación del Departamento de Servicios Sociales. Su hermana pesaba alrededor de 280 libras. El día anterior a los hechos, la vio en su hogar, le dijo que iba al baño, salió y le pidió una toalla sanitaria por que estaba menstruando. Su hermana era derecha, no practicaba ningún deporte, no tenía conocimiento del uso y manejo de armas de fuego, nunca la vio con un arma de fuego, pues le tenía miedo. Su hermana le había aceptado que sostenía relaciones sexuales con el apelante, quien era casado; su esposa estaba enferma de la mente. Su hermana quería mucho a los hijos del apelante.*

*Para el 9 de marzo de 1988, la relación sentimental existente entre ellos había finalizado porque él había estado preso. Por razón de ese comentario, el fiscal pidió acercarse al estrado y luego de un receso le indicó al fiscal que la testigo limitara su testimonio sin decir que el apelante estaba preso. Luego el tribunal instruyó al jurado de que el comentario de la testigo no debía ser considerado por ellos en ningún momento. Se le enseñó posteriormente una fotografía a la testigo, quien declaró que en ésta se encontraba su hermana y el hijo de ella, quien estaba preso.*

**Undécimo Testigo: Edda L. Rodríguez Morales (patóloga), a las págs. 141-162 de la transcripción.**

Luego de que el Ministerio Público interrogara ampliamente a la testigo con miras a cualificarla como perito en el área de ciencias forenses, solicitó se aceptara como tal, a lo que no tuvo reparo la representación del apelante. Declaró que la razón por la cual la patóloga Dra. Ofelia G. Vera, que realizó la autopsia de la occisa, no estaba en el tribunal para declarar como tal, fue que se había retirado y posteriormente murió de cáncer. Declaró sobre los procedimientos para sustituir un patólogo que realiza una autopsia criminal, cuando éste se jubila, se retira o fallece. Declaró que la Dra. María S. Conte, supervisora de la División de Patología, le asignó la referida autopsia y sobre los hallazgos contenidos en el informe de autopsia número 92188 que le fuera asignada, realizada a Jeanette González Serrano, por la Dra. Ofelia G. Vera, patóloga forense, quien había fallecido a la fecha del juicio.

Sobre los hallazgos de la autopsia indicó, entre otras cosas, que la occisa mostraba dos heridas de bala, por debajo de la clavícula izquierda. El primer proyectil, según los estudios realizados, tuvo una trayectoria de izquierda a derecha, de adelante hacia atrás y de arriba hacia abajo. Significando *"que la persona que dispara o el proyectil tiene una inclinación y que la persona estaba en un plano de inferior al que le dispara. Lo que además es compatible con que la persona estuviese arrodillada"*.

En cuanto a los efectos de este primer proyectil indicó que *"perfora el segundo espacio entre el costal izquierdo y entre costilla y costilla hay músculos y eso se llama espacio intercostal, produce laceración del pulmón izquierdo, produce perforación de la aorta, fractura de la octava vértebra toráxica, produce laceración del corazón, laceración del pulmón, esas laceraciones producen que las cavidades se llenen de sangre y la persona se imposibilita de respirar, obviamente tiene afectado el corazón, no hay bombeo de sangre y las personas van a morir desangradas"*. Esa herida era de naturaleza fatal, impactó el corazón.

En relación con la segunda herida de bala indicó que estaba localizada también por el área de la clavícula izquierda, … una pulgada por debajo y una pulgada más a la izquierda que la herida de bala anterior. La trayectoria también es de izquierda a derecha, de arriba hacia abajo y de adelante hacia atrás; lo que es compatible con que la persona estuviese arrodillada.

Esta herida produce fractura de la tercera costilla izquierda, entra también por el segundo espacio intercostal, produce fractura de la tercera costilla izquierda, produce laceración de ambos lóbulos del pulmón izquierdo … produce laceración del diafragma…, del abdomen, estómago, páncreas, riñones, intestino, en la cavidad toráxica tenemos corazón, pulmones esófago y aorta, pasa a la cavidad abdominal, lacera el baso, produce un hemoperitoneo, que es sangre dentro de la cavidad abdominal… Esta herida también es una herida mortal.

Por otra parte indicó que según las anotaciones finales de la Dra. Vera, la autopsia evidenció que la muerte fue debido a laceración y perforación de órganos internos por heridas de bala que muestran características de tiro de distancia (a más de dos pies). En cuanto a las distintas clases de heridas de bala indicó que existen las heridas de contacto, de distancia intermedia, y las de distancia. La herida de contacto es la que se produce con el cañón del arma pegado a la piel. En la intermedia hay una separación de menos de dos pies y va a dejar unas características que es un confiado de pólvora quemada que produce lo que ellos llaman un tatuaje.

A preguntas del Fiscal indicó que ese tatuaje se produce en la piel, y que en este caso no se encontró que el tiro fuese de contacto, ni que existiera un tatuaje de pólvora en la piel de la víctima. Por otra parte indicó que el tiro de distancia es aquél que se efectúa desde una distancia mínima de dos pies. Es decir, de dos pies para arriba, tres, cuatro, etc.

Ante la posibilidad de que la propia víctima se hubiera infligido las heridas, la patóloga indicó que en tal

caso, se trataría básicamente de un tiro de contacto, y que el arma hubiera caído cerca de la persona que se produce las heridas. Es decir si estaba arrodillada, podría haber caído debajo del cuerpo, y si estaba de pie a cuestión de centímetros.

**Duodécimo Testigo: Eladio Rivera Rossy (agente del Negociado de Crímenes Violentos), a las págs. 162-168 de la transcripción.**

Declaró que trabajaba en el Negociado de Crímenes Violentos de la Policía de P.R. Llevaba 17 años laborando en el CIC. Con la creación del Negociado de Crímenes Violentos se comenzaron a investigar todos los casos de muertes violentas y se crea una unidad de análisis y seguimiento para todos aquellos casos que todavía no se habían esclarecido en P.R.; siéndole asignado el presente caso. Una vez se le asigna el caso, se reúne con el agente investigador Fernando Vals, entrevistó a Montijo, a los vigilantes de recursos naturales. En la investigación, los vigilantes le manifestaron que el arma de fuego encontrada en la escena había sido removida de ésta. Cotejó el informe original en donde aparece que el arma estaba a dos pies del área de la cabeza de la occisa. Posteriormente, cuando analiza nuevamente el caso luego de entrevistar a los testigos, surge que el arma removida de la escena estaba originalmente aproximadamente a más de siete pies. Finalmente indicó que de la investigación realizada surgió que el apelante conocía el uso y manejo de armas de fuego.

Sometido el caso por el Ministerio Público, el apelante no presentó prueba. Como hemos informado, el jurado lo encontró culpable por el delito de asesinato en primer grado; emitiendo el TPI su fallo condenatorio, siendo sentenciado el 23 de abril de 2001, a cumplir 99 años de cárcel, más 49 años con 6 meses por la reincidencia, sin costas. Inconforme, recurre imputándole al TPI los siguientes errores:

*"1. La inexcusable tardanza negligente del Ministerio Público al someter el caso por asesinato en primer grado doce años y medio después de haber investigado y analizado los hechos el 10 de marzo de 1988, menoscabó el debido proceso de ley del acusado provocando que no tuviera un juicio justo e imparcial en el 2001.*

*2. La prueba circunstancial, sobre posibles teorías de cómo ocurrieron los hechos, fue insuficiente en derecho al no probar todos los elementos del delito de asesinato en primer grado y no probar la culpabilidad más allá de duda razonable.*

*3. Erró el jurado al darle credibilidad a la opinión concluyente de la patóloga en cuanto a que la occisa recibió los disparos estando arrodillada, conclusión solicitada por el Juez basada en una premisa limitada y exclusivamente en el Informe Forense de Autopsia sin tener el beneficio de conocer el resto de la prueba presentada incluyendo las fotografías.*

*4. Erró el jurado al darle credibilidad al perito Químico, José Mercado Negrón, opinando trece años después que los análisis de prueba de parafina hechas por el Químico Forense, Mario Tripari López, en 1988, y que dieron positivo a residuos de nitratos en ambas manos de la occisa como a las del herido por el uso de armas de fuego, ahora estaban obsoletas, opinión que provocó que el jurado descartara esa prueba como pertinente y favorable al acusado."*

**III**

En su alegato, el apelante dedica gran esfuerzo a discutir su alegado primer error, consistente en la alegada inexcusable tardanza del Ministerio Público al someter el caso. Un examen de los autos, nos convence de que dicha controversia no fue objeto de alegaciones ni planteada en el TPI. Es norma reconocida en nuestro ordenamiento jurídico que las partes en un pleito deben brindarle al Tribunal de Primera Instancia una oportunidad adecuada de resolver los asuntos que hayan de ser planteados posteriormente en un recurso. *González v. Corte*, 54 D.P.R. 489, 492-493 (1939); *Giménez v. Corte*, 56 D.P.R. 236, 239 (1940); *Autoridad de*

*Fuentes Fluviales v. Corte,* 65 D.P.R. 935, 937 (1946); *Trabal Morales v. Ruiz Rodríguez,* 125 D.P.R. 340, 351 (1990). No obstante, discutiremos el alegado error. Veamos.

Para que se active la protección que ofrece el debido proceso de ley en su vertiente procesal, tiene que existir un interés individual de libertad o de propiedad, *Rivera Santiago v. Secretario de Hacienda,* 119 D.P.R. 265 (1987). La garantía esencial de la cláusula del debido proceso es que sea justa. El procedimiento debe ser fundamentalmente justo al individuo en la resolución de los hechos y derechos que sirven de base para aquellas acciones gubernamentales que le privan de su vida, libertad o propiedad. *Id,* a la pág. 274.

Dentro de los componentes básicos del debido proceso de ley en su vertiente procesal penal, hemos expresado que, de ordinario, el único término que *"obliga"* al estado a actuar es el término prescriptivo que el ordenamiento señala para los delitos. Ciertamente, el Estado no está en la obligación de radicar el caso ante el foro judicial hasta que no haya completado la investigación del mismo. Lo antes dicho no significa que el Estado, estando en posición de someter los casos, innecesariamente se *"cruce de brazos"* durante años, situando a la persona, cuyo interés de libertad esté en juego, en un estado de indefensión. Esta dilación injustificada puede constituir una violación al debido proceso de ley. La existencia de perjuicio por la dilación del Estado es generalmente necesaria, pero no necesariamente suficiente para sostener una alegación de violación al debido proceso de ley. (Citas Omitidas.) *Pueblo v. Esquilín Maldonado,* Op. de 19 de octubre de 2000, **2000 J.T.S. 164,** a la pág. 235.

Para que exista la violación al debido proceso de ley, debe concluirse que el interés en no perjudicar la defensa del acusado y su derecho a un juicio justo e imparcial se sobrepone en las circunstancias específicas que presente el caso al interés del gobierno en la dilación resultante. *Pueblo v. Padilla Arroyo,* 104 D.P.R. 103, 107 (1975). En otras palabras, para que proceda un dictamen de violación al debido proceso de ley de la persona antes de su denuncia: (1) ésta debe demostrar que la dilación le causó un estado de indefensión; (2) y que la razón que tuvo el Estado para tal dilación no está razonablemente justificada más allá de la liberalidad con que se debe analizar el proceso investigativo. *Pueblo v. Esquilín, supra,* a la pág. 236.

Añadió nuestro Tribunal Supremo en el caso de *Pueblo v. Esquilín,* a la pág. 236, que:

*"Para demostrar que la dilación del Estado en radicar la acusación le ha causado perjuicio al acusado, éste tiene que presentar prueba que señale que la dilación le ha provocado un estado de indefensión. La cantidad de prueba requerida es la de preponderancia de evidencia. Entre otras, se puede considerar como prueba fehaciente del perjuicio causado por la dilación, la incapacidad del acusado o testigos para recordar las circunstancias particulares del día de los alegados hechos delictivos. También se puede tomar en consideración la no-disponibilidad, por haber pasado tanto tiempo, de testigos que hubiesen podido declarar a favor de la acusada, pero que ya se desconoce genuinamente su paradero.*

*Luego que el acusado cumpla con este peso de la prueba, si quiere prevalecer, el Estado debe demostrar que el alegado perjuicio de indefensión no ocurrió o que su dilación no fue intencional u opresiva."* (Citas Omitidas.)

En el caso de autos, alega el apelante que se violentó la protección que le brinda el debido proceso de ley, toda vez que al haberse sometido el caso aproximadamente doce años después de haber ocurrido los hechos, ello lo colocó en un estado de indefensión. Alega que el estado de indefensión surge de no haber podido contra interrogar a la patóloga forense que practicó la autopsia, así como al químico forense Mario Tripari López, quien realizó la prueba de guantelete de parafina tanto a su persona como a la víctima, para determinar la presencia de nitrato. Y que también lo coloca en estado de indefensión, el hecho de que hoy día está obsoleta la prueba de guantelete de parafina, que resultó positiva en ambos casos. Lo que implica que la prueba que antes era pertinente y válida para corroborar la legítima defensa alegada por el apelante, ahora no está disponible.

Por su parte, alega el Ministerio Público que la dilación en radicar cargos contra el apelante no fue intencional, y que la misma obedeció a que la investigación no estaba culminada en el año 1988, como alega el apelante; sino que la misma continuó hasta que el Ministerio Público descubrió que el revólver utilizado en los hechos había sido movido de su posición original en el lugar de los hechos, y se obtuvo toda la prueba necesaria para poder probar el caso. Lo que según el apelante se reduce a un mero aspecto de credibilidad, que no era definitivo para que el Ministerio Público probara su caso. De la totalidad de las circunstancias se desprende que al apelante no le asiste la razón. Veamos.

Según surge de la transcripción de la prueba presentada en el juicio, los hechos del caso se suscitaron en un paraje solitario, donde la única versión de lo sucedido la ofreció el apelante. Así pues, para probar su caso, el Ministerio Público tenía que recurrir a prueba circunstancial, lo que imposibilitó el radicar cargos en el año 1988, toda vez que no es hasta el momento en que se reabrió la investigación, que surge que el arma de fuego utilizada en los hechos había sido movida del lugar en que originalmente se encontraba. Dicha prueba, aunque sujeta a un análisis de credibilidad, era pertinente para establecer los elementos del delito. Nótese que ante la alegada legítima defensa del apelante, y ante la posibilidad de que la víctima se hubiera disparado ella misma, el lugar en que se hubiera encontrado el arma era sumamente importante para sostener o eliminar estas teorías.

Por otro lado, el hecho de que el apelante no hubiera podido contra interrogar a la Dra. Vera, (patóloga que realizó la autopsia, quien había fallecido a la fecha del juicio), y al químico de ciencias forenses, tampoco lo colocó en un estado de indefensión, toda vez que tuvo acceso al informe de autopsia y pudo contra interrogar a los peritos que sobre dichos informes declararon en el juicio.

Por versar los errores tercero y cuarto sobre la credibilidad que los testigos le merecieron al jurado, procederemos a discutirlos en conjunto en este momento.

Dispone la Regla 65 (H) de Evidencia, 32 L.P.R.A. Ap. IV, que es admisible como excepción a la regla de prueba de referencia aunque el declarante esté disponible como testigo:

*"(H) Récord e informes oficiales- Evidencia de un escrito hecho como récord o informe de un acto, condición o evento, cuando se ofrece para probar el acto, condición o evento, si el escrito fue hecho en o cerca del momento del acto, condición o evento, por y dentro del ámbito del deber de un empleado público, siempre que las fuentes de información y el método y momento de preparación fueran tales que indican su confiabilidad."*

El término *"documento público"* tiene varias acepciones. En ocasiones, lo hemos utilizado para referirnos a documentos que están a la disposición de todos; que no son confidenciales. En otras ocasiones, lo hemos utilizado para referirnos a los documentos oficiales preparados por funcionarios públicos en el desempeño de un deber público. Por estar comprendido el protocolo de autopsia en la clase de documentos públicos denominada *"documentos oficiales"*, es admisible y constituye evidencia *prima facie* de los hechos consignados en él. (Citas Omitidas.) *Pueblo v. Millán Meléndez*, 110 D.P.R. 171, 175-176 (1980).

En el caso de autos, tanto la patóloga Dra. Vera, como el Sr. Tripari, químico forense, no estuvieron presentes en el juicio. No obstante, tanto la Dra. Edda Rodríguez Morales, patóloga, como José Mercado Negrón, químico del instituto de ciencias forenses, fueron admitidos como peritos por el TPI, por lo que podían dar sus opiniones periciales basadas en otras fuentes (en este caso, los informes preparados por la patóloga y el químico anterior), los que eran de por sí admisibles en evidencia de conformidad con la Regla 65 (H), *supra*; e incluso podían opinar sobre la cuestión última. Reglas 56 y 57 de Evidencia, *supra*. Véase, *Pueblo v. Mattei Torres*, 121 D.P.R. 600 (1988). Además, ambos testigos estuvieron sujetos a ser contrainterrogados por la representación del apelante. En consecuencia, el primer, tercer y cuarto error no fueron cometidos.

Así pues, pasemos a considerar si la prueba circunstancial presentada por el Ministerio Público, fue suficiente para probar todos los elementos del delito de asesinato en primer grado, más allá de duda razonable.

Sabido es que la culpabilidad de un acusado tiene que ser probada más allá de duda razonable; no obstante, *"ello no significa que toda duda posible, especulativa o imaginaria tenga que ser destruida a los fines de establecer la culpabilidad del acusado con certeza matemática. Sólo se exige que la prueba establezca aquella certeza moral que convence, dirige la inteligencia y satisface la razón."* Pueblo v. Rosario Reyes, 138 D.P.R. 591, 598 (1995). Véase además, *Pueblo v. Pagán, Ortiz,* 130 D.P.R. 470, 480 (1992); *Pueblo v. Bigio Pastrana,* 116 D.P.R. 748, 760-761 (1985).

Así pues, la prueba que se presente para establecer la comisión del delito debe ser satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación. *Pueblo v. Rodríguez Santana,* Op. de 23 de octubre de 1998, **98 J.T.S. 141**, a la pág. 234; *Pueblo v. Colón Castillo,* 140 D.P.R. 564, 582 (1996). La insatisfacción con la prueba es lo que se conoce como duda razonable y fundada. (Citas Omitidas) *Pueblo v. De León Martínez,* 132 D.P.R. 746, 765 (1993). Duda razonable no es meramente una duda posible. Existe duda razonable cuando después de un cuidadoso análisis, examen y comparación de toda la prueba, queda el ánimo del juez en tal situación, que no puede decidir si tiene una firme convicción o certeza moral con respecto a la verdad de los hechos envueltos en la acusación.

En *Pueblo v. Cruz Granados,* 116 D.P.R. 3, 21 (1984), nuestro Tribunal Supremo señaló con respecto a la duda razonable lo siguiente:

*"Esto no significa que deba destruirse toda duda posible ni que la culpabilidad del acusado tenga que establecerse con certeza matemática, sino que la evidencia debe producir aquella certeza moral que convence, dirige la inteligencia y satisface la razón. Duda razonable es una duda fundada, producto del raciocinio de todos los elementos de juicio envueltos en el caso. No debe ser, pues, una duda especulativa o imaginaria. La duda que justifica la absolución no sólo debe ser razonable, sino que debe surgir de una serena, justa e imparcial consideración de toda la evidencia del caso o de la falta de suficiente prueba en apoyo de la acusación".*

Como es sabido, la apreciación que hace un juzgador de la evidencia desfilada durante un proceso judicial criminal es una cuestión mixta de hecho y de derecho... Es por ello que la determinación que ha hecho el juzgador de los hechos en el ámbito de instancia a los efectos de que la culpabilidad del imputado de delito ha quedado establecida mas allá de duda razonable, es una que es revisable en apelación como *"cuestión de derecho".* Pueblo v. Cabán Torres, 117 D.P.R. 645, 653 (1986). No obstante, al apreciar la evidencia presentada ante el juzgador de los hechos, los tribunales apelativos deben reconocer la inigualable posición en que está el Tribunal de Primera Instancia. Por ello y con el fin de mantener un adecuado balance al evaluar el veredicto recaído, en la medida en que los jueces de primera instancia y los jurados están en mejor posición de apreciar y aquilatar la prueba presentada, su apreciación merecerá gran deferencia y los tribunales apelativos no intervendrán con la misma en ausencia de pasión, prejuicio, parcialidad o error manifiesto. *Pueblo v. Rodríguez Santana, supra,* a la pág. 234; *Pueblo v. Dávila Delgado,* 143 D.P.R. 157, 173 (1997); *Pueblo v. Chévere Heredia,* 139 D.P.R. 1, 16 (1995); *Pueblo v. Torres Rivera,* 137 D.P.R. 630, 640-641 (1994); *Pueblo v. Maisonave Rodríguez,* 129 D.P.R. 49, 62-63 (1991); *Pueblo v. Cabán Torres, supra,* a las págs. 653-654 (1986). Sin embargo, esto no hace que dichas determinaciones sean infalibles.

*"[D]e ahí en [sic] que en muchos casos no hemos vacilado en dejar sin efecto un fallo condenatorio cuando un análisis de la prueba que tuvo ante sí el tribunal sentenciador nos deja serias dudas, razonables y fundadas, sobre la culpabilidad del acusado... Hasta tanto se disponga de un método infalible para averiguar sin lugar a dudas dónde está la verdad, su determinación tendrá que ser una cuestión de conciencia."* Pueblo v. González Román, supra, a la pág. 708.

Por otra parte, la Regla 10(H) de Evidencia, 32 L.P.R.A. Ap. IV, R. 10 H, dispone que cualquier hecho en controversia es susceptible de ser demostrado mediante evidencia directa, o mediante evidencia indirecta o circunstancial. Entendiéndose por evidencia indirecta o circunstancial, aquélla que tiende a demostrar el hecho en controversia probando otro distinto, del cual, en unión a otros hechos ya establecidos, puede razonablemente inferirse el hecho en controversia.

Así pues, para que se configure el delito de asesinato, es necesario probar que se dio muerte a un ser humano con malicia premeditada. Artículo 82 del Código Penal de Puerto Rico, 33 L.P.R.A. § 4001. Esto es, la ausencia de justa causa o excusa al ocasionar la muerte, e implica la existencia de la intención de ocasionar la muerte de un semejante. *Pueblo v. González Pagán*, 120 D.P.R. 684, 689 (1988). La diferencia entre los dos grados de asesinato consiste en que en el asesinato en primer grado la muerte se realiza con malicia premeditada y deliberada, mientras que en el asesinato en segundo grado la muerte es maliciosa y premeditada, pero sin que medie la deliberación. *Pueblo v. Rivera Alicea*, 125 D.P.R. 37, 45 (1989). El elemento mental general requerido en el delito genérico de asesinato lo es el de *"malicia premeditada"*, el cual ha sido definido como:

*"... la ausencia de justa causa o excusa al ocasionar la muerte e implica además la existencia de la intención de ocasionar la muerte de un semejante. Esa intención se puede manifestar a través de uno de los dos siguientes elementos, cualquiera de los cuales es suficiente para determinar la existencia de malicia premeditada, a saber: (a) la intención específica de matar, considerada como equivalente al deseo y propósito directo, explícito y definido de matar, o sea, precisamente formulado con el objetivo directo de matar, o (b) la intención de realizar un acto o de producir un grave daño corporal cuya consecuencia probable sea la muerte de una persona. Este criterio se refiere a la peligrosidad envuelta en la actuación de un acusado, en el sentido de creación de un riesgo sustancial de muerte."* (Citas Omitidas) *Pueblo v. Robles*, 132 D.P.R. 554, 563 (1993).

Por otro lado, la deliberación es la resolución o decisión de matar después de darle alguna consideración. *Pueblo v. Torres Montañez*, 106 D.P.R. 125, 129 (1977). La ley no requiere un determinado espacio de tiempo para la deliberación y premeditación necesaria para una convicción por asesinato en primer grado. *Pueblo v. Merced Jiménez*, 100 D.P.R. 270, 281 (1971). Ese lapso de tiempo puede ser tan rápido como el pensamiento. *Pueblo v. Rosario*, 67 D.P.R. 371, 375 (1947). La malicia premeditada y la deliberación pueden concebirse en el mismo momento de la realización del ataque. *Pueblo v. Merced, supra*, pág. 281. Véase además, *Pueblo v. González Pagán*, 120 D.P.R. 684, 689 (1988). La deliberación es un acto subjetivo del acusado; no puede probarse con evidencia directa y se precisa por lo tanto, recurrir a los hechos del caso para determinar si de ellos puede inferirse racionalmente dicha deliberación. Los elementos de premeditación y deliberación pueden deducirse de las circunstancias y relación entre las partes, así como de los actos y conducta del acusado. (Citas Omitidas.) *Pueblo v. López Rodríguez*, 101 D.P.R. 897, 898, 899 (1974). La intención de ocasionar la muerte se puede manifestar al realizar un acto o al producir un grave daño corporal, cuya consecuencia probable sea la muerte de la persona. *Pueblo v. Rivera Alicea*, 125 D.P.R. 37, 45 (1989). La existencia de malicia es lo que distingue los delitos de asesinato y homicidio; la malicia puede inferirse del uso de un arma, ya que tal uso puede implicar razonablemente una intención de matar o de causar daños cuya consecuencia probable sea la muerte. *Pueblo v. Méndez*, 74 D.P.R. 913 (1953); *Pueblo v. Colón Soto*, 109 D.P.R. 545, 548-549 (1980). Por ello, la malicia premeditada debe ser determinada a base de los hechos, los actos y las circunstancias que rodean la muerte, la capacidad mental, la motivación, las manifestaciones y la conducta del acusado. Atacar con un arma a una persona desarmada es una actuación de la cual puede inferirse la intención de causar la muerte a dicha persona. *Pueblo v. Rivera Alicea*, 125 D.P.R. 37, 45 (1989).

No existe presunción de ley a base de la cual pueda demostrarse que se ha actuado con malicia premeditada y deliberación. *Pueblo v. Torres Montañez, supra*, págs. 129-130. De las circunstancias en que se produce un asesinato puede deducirse racionalmente, pero no presumirse la deliberación. *Pueblo v. Torres Montañez, supra*. La deliberación es un acto subjetivo del acusado y por tanto es preciso recurrir a los hechos del caso para determinar si de ellos puede racionalmente inferirse la deliberación. *Pueblo v. López Rodríguez*, 101 D.P.R.

897, 898-899 (1974). Por lo que la presencia o ausencia de deliberación es cuestión a ser resuelta por el jurado. *Pueblo v. Jiménez, supra.*

En el caso de autos de la totalidad de la prueba presentada, surge que la occisa recibió dos heridas de bala, la primera de ellas de carácter fatal, desde una distancia de entre 2 a 6 pies, con una trayectoria de arriba hacia abajo, lo que descarta en gran medida la posibilidad de que ella se hubiera producido las heridas. Ello unión a circunstancias tales como: (1) la distancia en que originalmente fue encontrada el arma; (2) el hecho de que entre la occisa y el apelante existía una relación sentimental que había finalizado; (3) la occisa desconocía el uso y manejo de un arma de fuego, y le tenía miedo; el apelante había sido convicto anteriormente por infracción al Artículo 8 de la anterior Ley de Armas (portar un arma de fuego cargada); y (4) de conformidad con el testimonio pericial de la patóloga, de que según la trayectoria de las balas ello era compatible que la occisa se encontrara de rodillas o en posición inferior a la de su atacante cuando recibió los disparos, dejaron establecidos, más allá de duda razonable, la comisión del delito de asesinato en primer grado y la relación del apelante con su comisión.

Sabido es que la exposición de la teoría de las partes no tiene valor probatorio alguno, *Pueblo v. Calderón Rodríguez,* 97 D.P.R. 261 (1969); *Pueblo v. Hernández Santiago,* 97 D.P.R. 522 (1969), y que un imputado de delito no viene obligado a presentar prueba alguna para establecer su inocencia, recayendo la responsabilidad de probar la culpabilidad de éste más allá de duda razonable, en el Ministerio Público. No obstante, de haber el apelante presentado prueba sobre legítima defensa, no hubiese prosperado. Veamos.

Sabido es que para que prospere esta defensa es necesario que existan circunstancias que hicieren creer razonablemente que se ha de sufrir un daño inminente, siempre que hubiere necesidad racional del medio empleado para impedir o repeler el daño, falta de provocación suficiente del que ejerce la defensa, y que no se ocasione más daño que el necesario al objeto. Para justificar el dar muerte a un ser humano, cuando se alegue legítima defensa, es necesario tener motivos fundados para creer que al dar muerte al agresor se hallaba el agredido o la persona defendida en inminente o inmediato peligro de muerte o de grave daño corporal. En este caso, aun cuando se pudiera determinar que la occisa fue la que atacó al apelante, se desprende claramente que ésta recibió dos heridas, la primera de las cuales, era de carácter fatal, lo que implica que se causó más daño que el necesario, para repeler el ataque.

Una lectura reflexiva, serena y desapasionada de la transcripción de la prueba desfilada en el juicio, nos mueve a concluir que la prueba circun1stancial presentada en el juicio por el Ministerio Público, y no refutada por el apelante, demostraron su culpabilidad más allá de duda razonable. La muerte de Jeannette González Serrano fue causada deliberada y premeditadamente, y la prueba conectó al apelante con dicha muerte.

En mérito a lo expuesto, confirmamos la Sentencia dictada el 23 de abril de 2001, por el Tribunal de Primera Instancia, Sala Superior de Utuado.

Lo acordó el Tribunal y lo certifica la Secretaria General.

Aida I. Oquendo Graulau
Secretaria General